VIRGINIA CHAPTER, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., etc. and Rowland Electric Company, Inc., Plaintiffs,

v.

Juanita KREPS, Secretary of Commerce of the United States of America, et al., Defendants.

Civ. A. No. 77–0478.

United States District Court,
W. D. Virginia,
Abingdon Division.

Jan. 24, 1978.

William H. King, Jr., James F. Stutts, Richard L. Williams, McGuire, Woods & Battle, Richmond, Va., for plaintiffs.

Deborah M. Seymour, Drew S. Days, III, Robert T. Moore, Dept. of Justice, Washington, D. C., Paul R. Thomson, Jr., U. S. Atty., Roanoke, Va., for Federal defendants.

John H. Tate, Jr., Gwyn & Tate, Marion, Va., for Smyth County defendants.

OPINION

TURK, Chief Judge.

I.

INTRODUCTION

In this action plaintiffs, Virginia Chapter, Associated General Contractors of America, Inc. and Rowland Electric Company, Inc. seek a preliminary injunction pursuant to Rule 65(a) restraining defendants, federal, state and local officials from enforcing certain portions of the Public Works Employment Act of 1976, and particularly one of the 1977 amendments to the act. Plaintiffs sue under the Fifth Amendment of the United States Constitution, 42 U.S.C. § 1981, 42 U.S.C. § 2000d and 42 U.S.C. § 6727, alleging jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 28 U.S.C. § 1343. They seek declaratory relief by virtue of 28 U.S.C. § 2201, 28 U.S.C. § 2202, and plaintiff Rowland Electric Company, Inc. seeks damages for lost profits. They allege venue is proper in the Western District of Virginia by virtue of 28 U.S.C. § 1391(e).

Plaintiffs filed suit on December 6, 1977 and the court heard argument on plaintiff's application for a preliminary injunction on December 12, 1977. The court allowed both sides additional time to file supporting briefs after argument. As required by Rule 52(a) and 65(a) of the Federal Rules of Civil Procedure, this memorandum opinion serves as the court's findings of fact and conclusions of law regarding plaintiffs' application for a preliminary injunction. *See* Fed.R.Civ.P. 52(a); Fed.R.Civ.P. 65(a); *Blackwelder Furniture Company v. Seilig Manufacturing Company, Inc.,* 550 F.2d 189, 192 n. 1 (4th Cir. 1977).

II.

PLAINTIFFS' COMPLAINT

The essence of plaintiffs' complaint is that Congress, by its 1977 amendments to the Public Works Employment Act of 1976, created an impermissable racial classification that violates the equal protection guar-

antee implicit in the Fifth Amendment.[1] Specifically, plaintiffs claim one of the 1977 amendments, 42 U.S.C. § 6705(f)(2), is an illegal racial "quota" which cannot withstand the strict judicial scrutiny required of racial classifications. 42 U.S.C. § 6705(f)(2) provides:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprise" means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

Plaintiffs allege that the 10% Minority Business Enterprise requirement (hereinafter "MBE requirement") for local contracts awarded under the Public Works Employment Act of 1976 (hereinafter "PWEA") deprives them of their right to be free from racial discrimination, a right protected by the Due Process Clause of the Fifth Amendment. Plaintiffs allege the 10% MBE requirement is a naked racial "quota", not a "goal" or remedy designed to alleviate the present effects of past racial discrimination against minority enterprises. They state that, "[r]acially focused remedies are not constitutionally permissable un-less there has been a documented finding of previous discrimination which the remedy is designed to address, and, even then, the remedy may go no further than a correction of the past injuries." *Complaint*, ¶ 25.

Plaintiffs seek injunctive relief to prevent federal defendants from requiring local entities to grant assurances that at least 10% of all monies expended for local grants will be contracted to MBE companies. Plaintiffs seek injunctive relief to prevent federal defendants from taking any actions to penalize noncompliance with the 10% MBE requirement, and to prevent defendants from approving, advertising or awarding bids for projects which employ the 10% MBE requirement. Plaintiffs further ask to enjoin defendants from "approving or effectuating any approval given or in any way implementing the award by its grantee and agent, Smyth County, Virginia, of the Health and Social Service Center funded pursuant to the terms of the Act to any bidder other than the lowest qualified bidder." *Complaint*, ¶ 33. Plaintiffs seek a declaration that 42 U.S.C. § 6705(f)(2) is unconstitutional as violative of the Fifth Amendment, and a declaration that the policy, practice, custom and usage whereby federal, state and local agents have implemented the act is also unconstitutional. Plaintiff Rowland Electric Company, Inc. desires lost profits for its failure to gain the subcontract for electrical work on the Smyth County Center because of the 10% MBE requirement. Finally, plaintiffs seek an award of their costs, expenses and attorneys' fees in this litigation.

### III.

### JURISDICTION

■ The court finds it has subject-matter jurisdiction over plaintiffs' claims under at

---

1. Although the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. *E. g., Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Johnson v. Robinson,* 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Bolling v. Sharpe,* 347 U.S. 497, 499, 77 S.Ct. 753, 99 L.Ed. 1083 (1954); *see* L. Tribe, American Constitutional Law 272, 800, 810, 992, 1063 (1978); Karst, The Fifth Amendment's Guarantee of Equal Protection, 55 N.C.L.Rev. 542 (1977). In addition to their constitutional claims, plaintiffs allege the operation of 42 U.S.C. § 6705(f)(2) denies them the equal right to make and enforce contracts as granted all persons by 42 U.S.C. § 1981. They further allege the section violates mandates of nondiscrimination in federal programs. 42 U.S.C. § 2000d; 42 U.S.C. § 6727.

least two statutory grants of jurisdiction. Because plaintiffs have made good-faith allegations of at least $10,000 as the amount in controversy, *St. Paul Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 38, 82 L.Ed. 516 (1938), the court has jurisdiction under 28 U.S.C. § 1331. Also, because plaintiffs' claims arise under an Act of Congress regulating commerce jurisdiction under 28 U.S.C. § 1337 is proper. *E. g., Winningham v. United States Department of HUD,* 512 F.2d 617, 621–22 (5th Cir. 1975).

## IV.

## THE PUBLIC WORKS EMPLOYMENT ACT OF 1976 AND ITS 1977 AMENDMENTS

### A.

#### *Introduction*

The Public Works Employment Act of 1976 became law on July 22, 1976. 42 U.S.C. § 6701 *et seq*; P.L. 94–369. At that time Congress appropriated $2 billion for implementation of the act, with all funds to be spent prior to September 30, 1977. 42 U.S.C. § 6710; P.L. 94–447. The act was to be administered by the Secretary of Commerce, through the Economic Development Administration (hereinafter "EDA"), which was to distribute funds to state and local governments under the act. Grantees were required to contract out project construction to private firms through competitive bidding. 42 U.S.C. §§ 6701–6705; P.L. 94–369, Title I, SS. 102–106.

From October 26, 1976 until February 9, 1977, EDA received, processed, considered, approved and denied applications from state and local governments for assistance under the act. This period, referred to by the parties as "Round I" of the PWEA, resulted in the approval of approximately 2,000 projects. Even before EDA had finished processing applications under Round I, H.R. 11 and S. 427 were introduced in the House of Representatives on January 11, 1977 and in the Senate on January 25, 1977, respectively to provide additional funding under the act. After hearings and debate, the PWEA of 1977 became law on May 13, 1977. It amended the PWEA of 1976 and authorized the expenditure of an additional $4 billion for a "Round II" program of grants. The 10% MBE requirement was added by the 1977 amendments and is only applicable to grants made under Round II of the act.

### B.

#### *Round I*

The Report of the House Committee on Public Works and Transportation accompanying the legislation that authorized Round I stated that the PWEA, ". . . has a twofold purpose: (1) to alleviate the problem of nationwide unemployment, and (2) to stimulate the national economy by assisting State and local governments to build badly needed public facilities." Report No. 94–1077, 94th Cong., 2d Sess., at 2, U.S.Code Cong. & Admin.News 1976, pp. 1746, 1747. The report further stated:

> The Bill is carefully and expressly designed to avoid the long lag time sometimes associated with public works programs. . . . To be eligible for a grant, a project must be started within 90 days of its approval if Federal funds are available. The bill also provides that applications must be acted upon by the administrative agency within 60 days of the date of its receipt. *Id.,* at 3, U.S.Code Cong. & Admin.News 1976, p. 1748.

The congressional intent to obtain speedy action by EDA was manifested by the following provision of 42 U.S.C. § 6706 relating to the 60 day period:

> Failure to make such final determination within such period shall be deemed to be an approval by the Secretary of the grant requested.

42 U.S.C. § 6706 also required that regulations to implement the act be issued within 30 days of its enactment.

On December 23, 1976, EDA published a list of 1988 projects which had been provisionally selected for funding under Round I. 41 F.Reg. 56146. By February 9, 1977, final

project processing had been completed, and a total of approximately 2,000 projects had been approved. The 23,500 rejected applicants had requested a total of approximately $21.8 billion.

## C.

### Round II

The 1977 amendments to the PWEA were designed to resolve certain problems encountered in administering Round I. *See,* Report of the Committee on Public Works and Transportation, U.S. House of Representatives, "Local Public Works Capital Development and Investment Act Amendments," H.R.Rep.No. 95–20, 95th Cong., 1st Sess., at 3 (1977), U.S.Code Cong. & Admin. News 1977, p. 125 (hereinafter "House Report"); Report of the Committee on Environment and Public Works, U.S. Senate, "Public Works Employment Act of 1977," Sen.Rep.No. 95–38, 95th Cong., 1st Sess., at 2–3 (1977) (hereinafter "Senate Report").

The Senate Report stated hearings had revealed that changes were "in order to target Federal assistance more accurately into areas of greatest need" and that:

> There was unanimous agreement that the program, properly directed, would be a significant factor in the attack on unemployment. Furthermore, they (the witnesses) noted the lasting contribution that would be made to the economic stability and wellbeing of communities all over America through their public works projects (at 2).

The House Report stated the justification for continuation of the PWEA program as follows: [2]

> Unemployment levels, particularly in the construction industry, remain at unacceptable levels. Economic recovery is still weak nationally, exacerbated further by the severe winter with layoffs and shortages of fuel. The lagging recovery limits the capability of local governments to carry out normal programs of capital expenditure for needed facilities. State

and local government outlays for new construction for the 10-year period since 1967 have actually dropped in volume from $30.8 billion to 22 billion (using 1972 dollars). Continuation of the public works employment program will provide additional stimulus to the sluggish economy (at 1–2).

Congress again directed that funds under the act be expended on an expedited basis. The PWEA was enacted May 13, 1977. EDA was required to devise, establish and issue regulations and procedures, respond to inquiries, and to process and approve or deny thousands of applications by September 30, 1977.

The Economic Stimulus Appropriations Act appropriated $4 billion for Round II for the period ending September 30, 1977. 42 U.S.C. § 6710. Thus EDA was required to meet a September 30, 1977 deadline for obligation of all Round II funds. This deadline has been met, and all funds under the act have been obligated. The rationale for such speedy commitment of Round II funds was as follows:

> The impact of the severe winter on the economy and especially on unemployment levels provides additional reason for speedy commitment of these funds. The committee recommends haste in commitment of appropriated funds in order to achieve substantial project initiation this construction season. Senate Report at 45.

To insure speedy implementation of Round II, Congress added 42 U.S.C. § 6707(h)(1) to the PWEA, which provides:

> Except as provided in paragraph (2) of this subsection, the Secretary shall not consider or approve or make a grant for any project for which any application was not submitted for a grant under this Act on or before December 23, 1976.

The Senate Report, at 3, explained that this amendment was designed to assure that "grants can be awarded to take advantage of the 1977 construction season."

---

2. *See* remarks of Rep. Ertel, 123 Cong.Rec.H. 1458 (February 24, 1977); remarks of Rep. Oberstar, 123 Cong.Rec.H. 1406 (February 24, 1977), regarding the purposes of the PWEA.

Congress's interest in rapid implementation of the Round II program was manifested when it retained the requirements of 42 U.S.C. § 6706 of the PWEA that regulations were to be issued within 30 days of enactment, and that an application must either be approved or rejected by EDA within 60 days of receipt or the application is deemed approved as a matter of law. Finally, the requirement of 42 U.S.C. § 6705(d) that grantees commence construction within 90 days of project approval remained an important part of the legislation.

## D.

### The MBE Requirement

Congress was concerned that funds be expended consistent with national policies as expressed through other legislation and federal programs. *See, e. g.,* 42 U.S.C. §§ 6705, 6706, 6708, 6709. The 10% MBE requirement was among the special provisions drafted toward this end. 42 U.S.C. § 6705 requires:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprises" means a business at least 50 per centum of which is owned by minority group members or, in case of publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

The 10% MBE requirement amendment arose during floor debate in the House February 24, 1977. 123 Cong.Rec.H. 1441. Congress' purpose was to remedy the situation whereby "minority businesses have received only 1 percent of the Federal contract dollar despite repeated legislation, Ex-

ecutive Orders and regulations mandating affirmative efforts to include minority contractors in the Federal contracts pool." 123 Cong.Rec.S. 3910, March 10, 1977.

The Secretary has, in accordance with authority granted by 42 U.S.C. § 6706, promulgated regulations under this provision (13 C.F.R. 317.19(b); 42 F.Reg. 27434–27435 (May 27, 1977)) which provide:

> (b) . . . (1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.
>
> (2) The restriction contained in paragraph 1 of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured.

These statutory and regulatory provisions have been interpreted through two sets of guidelines. On June 6, 1977, the Department issued *Guidelines For Round II of the Local Public Works Program* (hereinafter "Round II Guidelines"), which read, in pertinent part (Section VIII. B.1, pp. 30–31):

> 1. Minority Business Enterprise. No grant shall be made under this Act for any project unless the applicant gives satisfactory assurance that at least 10 percent of the amount of each grant will be expended for contracts with and/or supplies from minority business enterprises.
>
> a. EDA will require each applicant to provide assurance, as part of the resubmission process, that it will meet the 10 percent minority business enterprise requirement. Each applicant must insert a clause, within the terms and conditions of his bidding documents, that will require any successful bidder to expend 10 percent of the bid amount for minority business enterprise located within a reasonable trade area determined in relation to

the nature of the services or supplies intended to be procured.

b. The applicant/grantee will have the right to request a partial or total waiver of this requirement. This waiver request may be made either at the time of resubmission of the project or subsequent to project approval. The applicant must provide a statement of justification in support of its requests for waiver. This statement must consider the following:

—The size of the minority population in the project area;

—the availability of minority enterprise in the reasonable trade area from which contractors, subcontractors, and suppliers will be drawn for the project;

—the efforts the grantee and prime contractors have exerted to enlist minority firms; and

—any other relevant facts.

The Regional Director will make the final determination as to whether the waiver will be granted.

In August 1977 EDA issued *Guidelines for 10% Minority Business Participation in LPW Grants* (hereinafter "MBE Guidelines") which set forth detailed instructions regarding implementation of the provision. The MBE *Guidelines* contemplate that, while grantees are primarily responsible for assuring compliance with the provision, they will work in cooperation with prime contractors in attempting to locate and involve minority enterprises in the various grant projects.

These guidelines require that "every Grantee should make sure that it knows the names, addresses and qualifications of all relevant MBEs *i. e.*, minority business enterprises . . ." MBE *Guidelines*, p. 4. The *Guidelines* point out that the Office of Minority Business Enterprise (MBE) in the U.S. Department of Commerce and the Small Business Administration (SBA) are prepared to assist grantees and prime contractors in fulfilling the MBE goal. MBE *Guidelines*, pp. 4–6, 16.

The MBE goal could be satisfied in a number of ways, depending on whether the particular project would be administered through a single prime contract involving subcontracts and/or substantial supply contracts, more than one prime contract, simple contracts, or a combination of prime and simple contracts. MBE *Guidelines*, pp. 7–9. For example, "[i]n the case of projects to be administered through one prime contract, the 10% MBE requirement would be met if the prime contractor is an MBE or if at least 10% of the grant funds were expended for MBE subcontractors or suppliers." MBE *Guidelines*, p. 7. In the case of projects involving more than one contract, "[s]ome of the contractors could themselves be MBEs—for example, contracts for engineering or other professional or supervising services or for landscaping, accounting or guard services. Some prime contracts could be with MBEs or could contain assurances for 10% MBE participation or for more than 10% MBE participation, with appropriate supporting names and addresses of MBE subcontractors or supplies. Other prime contracts could provide for less than 10% MBE participation." MBE *Guidelines*, p. 9. The main principle was that "it is the grantee's obligation to make sure that at least 10% of the grant funds as a whole will be expended for MBEs through its own simple or prime contracts or through the subcontracts or supply contracts of its prime contractors." *Id.*

Compliance with the requirement was monitored at the federal level through reporting provisions. MBE *Guidelines*, pp. 10–13. The grantee was to monitor the performance of its prime contractors. MBE *Guidelines*, p. 6. Sanctions were to be imposed in the event of noncompliance:

If a shortfall occurs, EDA will suspend the first letter of credit, or refuse to issue the second letter of credit, or, in extreme cases, terminate the grant, unless the grantee can demonstrate that the shortfall is not its fault or the fault of its prime contractor or unless the Grantee can demonstrate that the shortfall will be

made up during the remainder of the contract.

MBE *Guidelines*, pp. 6–7.

In the event there were insufficient qualified[3] minority enterprises in the relevant market area,[4] the grantee could apply to the EDA Regional Director for a waiver. MBE *Guidelines*, pp. 13–16. Waivers were to be considered on a project-by-project basis. The *Guidelines* stated:

> Ordinarily a waiver will be considered only after the Grantee and its prime contractors have taken every feasible action to achieve at least 10 % MBE participation. For example, if the Grantee or its prime contractors have taken all feasible steps to locate relevant MBEs and has requested all available qualified MBEs to participate as contractors, subcontractors or suppliers and not enough MBEs can or will participate to reach the 10 % MBE participation goal, a waiver request detailing the efforts of the Grantee and its prime contractor may be necessary in order for the project to proceed.

MBE *Guidelines*, pp. 14–15. The waiver request was to list "the efforts the Grantee and potential contractors have exerted to locate and enlist MBEs," and "the specific MBEs which were contacted and the reason each MBE was not used." Use of available referral sources such as OMBE and SBA will be considered. MBE *Guidelines*, pp. 14, 16.

The *Guidelines* contemplated that, in view of the showing which was required, "a waiver request would ordinarily be made after the initial bidding or negotiation procedures proved unsuccessful" MBE *Guidelines*, p. 15. The *Guidelines* also provided that a grantee in an area where the minority population was very small could apply for a waiver before requesting bids if the grantee could show that there were no available, qualified minority business enterprises which could reasonably be expected to furnish services or supply materials for the project. MBE *Guidelines*, p. 15.

On October 11, 1977, EDA issued a Technical Bulletin for the purpose of providing additional information to grantees and their contractors in meeting the 10 % MBE requirements. The Technical Bulletin set forth, as did the MBE *Guidelines*, the requirements that the grantee must satisfy in order to obtain a waiver. It was repeated from the MBE *Guidelines* in the Technical Bulletin that a waiver request must contain a listing of efforts taken to locate MBEs, including descriptions of contacts with OMBE and the SBA, and a listing of each MBE contacted and the reason each was not used. Also, the Technical Bulletin stated the criteria that would be used in evaluating a waiver request. It specifically stated that the most important criteria to be used in evaluating waiver requests would be the "efforts taken by the grantee and potential contractors to locate qualified, bona fide and available MBEs whose market area includes the project location." *Technical Bulletin*, p. 5.

### E.

### *Round II Results*

The EDA approved 8555 grants under the act nationwide, totalling $4 billion, with 105 grants to the Commonwealth of Virginia for state and for local, county and municipal public works projects, in an amount of $57,857,705. Included are two grants to Smyth County in the total amount of $1,539,000.

In the Commonwealth of Virginia, the 105 grants approved are expected to generate approximately 5,491 to 5,936 person years of employment, and to result in the direct employment of approximately 12,000 individuals, and the indirect employment of approximately 476 individuals. The two Smyth County grants are expected to generate 144–156 person years of employment, and to employ approximately 319 workers directly. Nationwide, the program is ex-

---

**3.** "Qualified" was defined in the *Guidelines* at p. 3 as able to "perform the services or supply the materials that are needed."

**4.** "Relevant market area" was defined in the Guidelines at page 3.

pected to generate approximately 475,450 to 514,000 person years of employment and to result in the direct employment of over one million individuals.

Advertising for bids, awarding of bids, and initiation of construction is well under way or most likely completed in Virginia and throughout the country. Consistent with the grantees' obligations under the Act to initiate work within 90 days of project approval *i. e.* at the latest before the end of calendar 1977, construction has in many instances already started.

## V.

### THE SMYTH COUNTY PROJECT

Pursuant to the PWEA, its implementing regulations and guidelines, Smyth County sought a grant of $1,024,000 from EDA to build a Health and Social Services Center. After receiving EDA approval of the grant, Smyth County officials sought bids from general contractors to construct the center. The officials notified prospective contractors that successful bidders would have to comply with all applicable regulations and guidelines, including the 10% MBE requirement. On November 1, 1977 plaintiff Rowland Electric Company, Inc. was contacted and asked to submit bids on the electrical subcontracting for the center by Cassell Brothers, Inc., Corte Construction Co., Lincoln Builders Supply Co., Inc., Richard E. Phillippi, Inc. and James R. Vannoy & Sons Construction Co., Inc. Plaintiff submitted a bid of $120,416 for the designated work. These five general contractors submitted their bids to the Smyth County officials. Prior to final submission of bids, Cassell Brothers, Inc. informed plaintiff it could not include plaintiff's bid of $120,416 in its final offer because to include it would make Cassell's bid nonresponsive for failure to comply with the 10% MBE requirement of the five general contractors, only Corte Construction Co. included plaintiff's bid in its final bid. Corte's bid was the lowest of the five submitted, but it did not receive the award because it was deemed nonresponsive by the Smyth County officials for failure to meet the 10% MBE requirement.

Cassell Brothers, Inc. was awarded the contract on November 29, 1977. Its successful bid included a bid for electrical subcontracting for $175,937 by C.L. Ray Electric Co., a minority electrical contractor. At oral argument the court was informed work began on the Center on December 5, 1977.

## VI.

### MBE LITIGATION

This suit is one of over fifteen suits filed across the nation challenging the constitutionality of the 1977 amendments to the PWEA and its 10% MBE requirement. A brief summary of these cases will illuminate the background against which this court must act.

In the first case to reach decision, *Constructors Association of Western Pennsylvania v. Kreps*, Civil Action No. 77–1035 (W.D.Pa. Oct. 13, 1977) the United States District Court held the 10% MBE requirement constitutional and denied a preliminary injunction. Plaintiff sought an expedited appeal to the United States Court of Appeals for the Third Circuit, and the case was argued January 3, 1978. The Court of Appeals, however, refused plaintiff's motion for an injunction pending appeal.

In the next case, *Associated General Contractors of California v. Secretary of Commerce*, Civ. No. 77–3738–AAH, 441 F.Supp. 955 (C.D.Cal. Nov. 2, 1977) the United States District Court declared the 10% MBE requirement unconstitutional. The court found the requirement to be violative of equal protection as a naked racial classification. The court entered a prospective injunction prohibiting enforcement of the 10% MBE requirement and its implementing regulations and guidelines in the City and County of Los Angeles. Both sides have noted direct appeals to the Supreme Court.

In the third case, *The Florida East Coast Chapter of the Associated General Contractors of America, Inc. v. Secretary of Commerce*, Case Number 77–8351–Civ.–JR (S.D. Fla. Nov. 3, 1977) the district court denied a

preliminary injunction. The court found plaintiff had failed to demonstrate that it would probably succeed on the merits of its claim, and that defendant would be irreparably injured by issuance of an injunction. On November 23, 1977 the United States Court of Appeals for the Fifth Circuit refused to grant plaintiff's motion for an injunction pending appeal. No. 77–3248 (5th Cir. Nov. 23, 1977). On December 27, 1977, by stipulation of the parties, the appeal was dismissed.

In the fourth case, *Associated General Contractors of Wyoming, Inc. v. Secretary of Commerce*, No. C77–222 (D.Wyo. Nov. 4, 1977) the court refused to grant a temporary restraining order. The court certified the case for immediate appeal to the Court of Appeals. In the fifth case, *Montana Contractors' Association v. Secretary of Commerce*, CV 77–62–M, 439 F.Supp. 1331 (D.Mont.1977) the court refused plaintiff's prayer for a preliminary injunction. After balancing the equities, the court felt issuance of an injunction would greatly injure the defendant. In the sixth case, *Ohio Contractors Association v. The Economic Development Administration*, No: C–1–77–619 (S.D.Ohio Nov. 22, 1977), *notice of appeal filed*, (S.D.Ohio Dec. 21, 1977), the court denied plaintiff's request for a preliminary injunction. In the seventh case, *General Building Contractors Association, Inc. v. Kreps*, No. 77–3682 (E.D.Pa. Dec. 9, 1977) the court, relying solely on the first case decided, denied a request for a preliminary injunction. In the eighth case, *Carolinas Branch, Associated General Contractors of America, Inc. v. Kreps*, Civil Action No. 77–2326, 442 F.Supp. 392 (D.S.C. Dec. 15, 1977) the court denied plaintiff's motion for a preliminary injunction. In the ninth case, *A. J. Raisch Paving Co. v. Kreps*, Civil No. 77–2497 GBH (N.D.Cal. Dec. 15, 1977) the court denied plaintiff's application for a preliminary injunction. An appeal was noted and the United States Court of Appeals for the Ninth Circuit has refused plaintiff's motion for an injunction pending appeal. In the tenth case, *Associated General Contractors of Kansas, Inc. v. Secretary of Commerce*, Case No. 77–4218 (D.Kan. Dec.

19, 1977) the court denied plaintiff's application for a preliminary injunction. In the eleventh case, *Fullilove v. Kreps*, 77 Civ. 5786, 443 F.Supp. 253 (HFW) (S.D.N.Y. Dec. 19, 1977) the court upheld the constitutionality of the 10% MBE requirement and denied relief.

In the twelfth case, *Wright Farms Construction, Inc. v. Kreps*, Civil Action File No. 77–260, 443 F.Supp. 253 (D.Vt. Dec. 23, 1977) the court found the act unconstitutional as applied to plaintiff. The court prospectively enjoined enforcement of the 10% MBE requirement concerning future contracts within the state.

The court is aware of at least four other pending suits which raise the same issues as the instant suit. *Associated General Contractors of America v. Kreps*, Civil Action No. 77–2017 (D.D.C.1977); *Arizona Chapter, Associated General Contractors of America, Inc. v. The Secretary of Commerce*, C.A. 77–868 (D.Ariz.1977); *Rhode Island Chapter, Associated General Contractors of America, Inc. v. Kreps*, Civil Action No. 77–0676 (D.R.I.1977); *Indiana Constructors, Inc. v. Kreps*, IP 77–602 (S.D.Ind.1977). Additionally, defendant Kreps informs the court that similar suits are pending in Bay City, Michigan and Grand Rapids, Michigan.

Thus two courts have found the 10% MBE requirement either facially unconstitutional or unconstitutional as applied and two courts have found the provision constitutional. As a general proposition, in denying injunctive relief, the courts have based their actions on the inability of plaintiffs to demonstrate a probability of success on the merits and the great burden placed upon defendants by issuance of injunctions, and that the public interest would not be served by issuance of injunctions.

## VII.

### STANDING

At the outset, defendants challenge the standing of plaintiff VAGC. to bring this suit. Defendant states, "the government submits that plaintiff AGC lacks standing

to bring this action because it has shown to injury in fact, and because it is therefore not likely to prevail on the merits."

■ The essence of the standing question, in its constitutional sense, is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). When a court considers a motion to dismiss for want of standing, the court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *Warth v. Seldin, supra*, 422 U.S. at 501, 95 S.Ct. 40.

In its complaint, VAGC alleges that it is a nonprofit corporation organized under the laws of the Commonwealth of Virginia to promote the common interest of general contractors in the building industry within the Commonwealth. *Complaint*, ¶ 2. It alleges one of its principal aims is the establishment of fair and nondiscriminatory competitive bidding practices for public construction projects. *Id.* VAGC further alleges that implementation of the MBE provision discriminates against its members on the basis of race and prevents the attainment of its organizational objectives of nondiscriminatory bidding on public contracts. *Complaint*, ¶ 27, 29, 31.

The most recent detailed analysis of associational standing was given by Mr. Justice Powell in *Warth v. Seldin, supra* in 1975. He wrote for the Court:

There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties. *E. g., NAACP v. Alabama, supra*,

[357 U.S. 449] at 458–460, [78 S.Ct. 1163, 2 L.Ed.2d 1488;] *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 183–187, [71 S.Ct. 624, 95 L.Ed. 817] (1951) (Jackson, J., concurring) . . . Even in the absence of injury to itself, an association may have standing solely as the representative of its members. *E. g., National Motor Freight Assn. v. United States*, 372 U.S. 246, [83 S.Ct. 688, 9 L.Ed.2d 709] (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. *See Sierra Club v. Morton*, 405 U.S. 727, [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972). The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. *Id.* at 734–741, [92 S.Ct. 1361.] So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

422 U.S. at 511, 95 S.Ct. at 2211.

Although this test is still the proper one for assessing standing, the Court recently stated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977):

Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

97 S.Ct. at 2441.

■ Although "pleadings must be something more than an ingenious academic exercise in the conceivable," *United States v.*

*SCRAP,* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), the complaint in this case clearly demonstrates plaintiff VAGC has standing to press its claims in this suit. Whether tested by the *Warth* or *Hunt* tests, or both, VAGC has pleaded sufficient facts to show its standing. It alleges a concrete injury to itself and its members, *Cf. Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and therefore establishes its right to invoke federal jurisdiction to decide its claims. Because it seeks only injunctive and declaratory relief, and not damages, *see Warth v. Seldin, supra,* 422 U.S. at 515, 95 S.Ct. 40, VAGC demonstrates that it would benefit from the remedial powers of this court.

This result is in conformity with all the courts which have considered challenges to the MBE provision. Three courts have explicitly found that local chapters of the AGC have standing, and other courts have implicitly found standing because they have acted in suits where local chapters were plaintiffs. *General Building Contractors Association, Inc. v. Kreps,* No. 77–3682 (E.D.Pa. Dec. 9, 1977); *Associated General Contractors of California v. Secretary of Commerce,* Civ. No. 77–3738–AAH, 441 F.Supp. 955 (C.D.Cal. Nov. 2, 1977); *Constructors Association of Western Pennsylvania v. Kreps,* Civil Action No. 77–1035 (W.D.Pa. Oct. 13, 1977).

Finally, there can be no serious doubt, and defendant Kreps does not state otherwise, that plaintiff Rowland Electric Company, Inc. has standing to sue. It has pleaded a claim based upon its concrete economic injury for the loss of the Smyth County contract. Nothing more is needed to establish its right to a federal resolution of its claims. *See Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 260, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Wright Farms Construction, Inc. v. Kreps,* Civil Action No. 77–260, 444 F.Supp. 1023 (D.Vt. Dec. 23, 1977).

## VIII.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendant Kreps claims the waiver provision available to grantees of Local Public Works projects of the 10% MBE requirement is an effective administrative remedy which plaintiffs should be required to exhaust before seeking judicial review of the constitutionality of the act. Kreps claims this suit should be dismissed for plaintiffs' failure to exhaust administrative remedies.

■ The doctrine of exhaustion of administrative remedies is well established in the area of administrative law. This doctrine provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The doctrine is applicable to a number of situations, and it is subject to numerous exceptions. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

■ One major exception is where a complaining party challenges the constitutionality of an underlying statute which creates an administrative program, tribunal or remedy. Such attacks on enabling statutes have been held exempt from the requirement of exhaustion, because an administrative body cannot be expected to rule on the constitutional validity of the very act which established it. *E. g., Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 252 (1975); *Johnson v. Robinson,* 415 U.S. 361, 368, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Public Utilities Commission of California v. United States,* 355 U.S. 534, 539–40, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); K. Davis, *Administrative Law Text* § 20.04 (3d ed.1972). This exception is similar to the result in First Amendment cases where parties complaining of illegal restraints upon their right to freedom of expression have been excused from applying for a permit which, if granted, would moot their claims. *E. g., Hynes v. Mayor of Oradell,* 425 U.S.

610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Staub v. City of Baxley*, 355 U.S. 313, 319, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Plaintiffs' challenge to the constitutional sufficiency of the MBE requirement clearly places its suit within one of these exceptions and prevents application of the exhaustion doctrine.

■ Another exception is where the complaining party alleges that existing remedies are not available or inadequate to grant full relief. In such cases, exhaustion has been excused. *McNeese v. Board of Education*, 373 U.S. 668, 674–76, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Davis, *supra* § 20.07. *Cf. Hadnott v. Laird*, 149 U.S.App. D.C. 358, 361–365, 463 F.2d 304, 307–11 (1972) (bypass of available and adequate administrative remedy precludes judicial review of plaintiffs' claims).

Even if the court were to find the general doctrine of exhaustion applicable, it would be hesitant to force plaintiffs to seek a waiver of the MBE requirement. Under applicable regulations the plaintiffs cannot seek a waiver, because only local grantees may request relief from the requirement. In such a situation, the alleged remedy provided by the waiver clause cannot be deemed available to plaintiffs.

■ No court which has considered the 10% MBE requirement has required exhaustion of administrative remedies, and two courts have explicitly found the doctrine inapplicable to these suits. *Associated General Contractors of California v. Secretary of Commerce*, Civ. No. 77–3738–AAH, 441 F.Supp. 955 (C.D.Cal. Nov. 2, 1977); *Constructors Association of Western Pennsylvania v. Kreps*, Civil Action No. 77–1035 (W.D.Pa. Oct. 13, 1977). This court agrees that exhaustion is not required.

---

**5.** Plaintiffs' reliance on *Henry* for the proposition that one might have an absolute right to preliminary relief is misplaced. Instead, *Henry* should be read as an abuse-of-discretion case. There, plaintiff established beyond doubt his

## IX.

## PLAINTIFFS' APPLICATION FOR AN INJUNCTION

### A.
### General Considerations

■ Rule 65(a) of the Federal Rules of Civil Procedure, which governs preliminary injunctions, does not state under what conditions a court may order injunctive relief. Absent explicit guidelines, courts have relied upon flexible standards concerning the propriety of injunctive relief. Thus the decision to grant a preliminary injunction is discretionary with the district court and may not be set aside on appeal unless an abuse of discretion is shown. *Consolidation Coal Co. v. Disabled Miners of Southern West Virginia*, 442 F.2d 1261, 1264 (4th Cir. 1971), *cert. denied,* 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1972); *West Virginia Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232, 235 (4th Cir. 1971). Of course, a judge's discretion in granting or denying relief is not boundless, *Henry v. Greenville Airport Authority*,[5] 284 F.2d 631 (4th Cir. 1960) (per curiam), and an appellate court will overturn a district court's decision if made under an improper legal standard, *Blackwelder Furniture Company v. Seilig Manufacturing Co.*, 550 F.2d 189, 193 (4th Cir. 1977). Because the decision is discretionary no party can claim an absolute right to injunctive relief. *First-Citizens Bank & Trust Co. v. Camp*, 432 F.2d 481, 483 (4th Cir. 1970). The Supreme Court established this rule in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944):

The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. Compare *Scripps-Howard Radio v. Federal Communications Comm'n*, 316 U.S. 4, 10, [62 S.Ct. 875, 86 L.Ed. 1229] and cases cited. Even

---

right to final relief. However, an intransigent district court judge refused a preliminary injunction. This was corrected on appeal because although the decision was discretionary, it was not insulated from review.

in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. *Meccano, Ltd. v. John Wanamaker*, 253 U.S. 136, 141, [40 S.Ct. 463, 64 L.Ed. 822;] *Rice & Adams Corp. v. Lathrop*, 278 U.S. 509, 514, [49 S.Ct. 10, 73 L.Ed. 520.]

321 U.S. at 440, 64 S.Ct. at 675.

■ In this circuit, the award of a preliminary injunction is governed by the test announced in *Blackwelder Furniture Company v. Seilig Manufacturing Company, Inc.*, 550 F.2d 189 (4th Cir. 1977). *See Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119 (4th Cir. 1977); *Hartnett v. Cleland*, 434 F.Supp. 18, 19–20 (D.S.C.1977); *Interbank Card Association v. Simms*, 431 F.Supp. 131, 134–35 (M.D.N.C.1977). Although some confusion existed before *Blackwelder* as to the correct standard for granting preliminary relief, *Blackwelder* was only a reassertion of the rule enunciated in *Sinclair Refining Co. v. Midland Oil Co.*, 55 F.2d 42 (4th Cir. 1932) and reiterated in *West Virginia Highlands Conservancy v. Island Creek Coal Company*, 441 F.2d 232 (4th Cir. 1971). *Blackwelder* established that the balance-of-hardship test announced in *Sinclair Refining Co.* governs the award of injunctive relief. *Ft. Sumter Tours, Inc., supra* at 1124; *Blackwelder, supra* at 194, 196.

The *Sinclair Refining/Blackwelder* test was recently summarized by Judge Winter in *Ft. Sumter Tours, Inc.* as meaning:

In *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4 Cir. 1977), we recently held that "in this circuit the trial court standard for interlocutory injunctive relief is the balance-of-hardship test." This means that, in determining whether to grant or to withhold interim injunctive relief, the district court should consider (a) the applicant's probable right, (b) the likelihood of danger to that right if interim relief is denied (irreparable injury), (c) the harm to other interested parties of issuing an injunction, and (d) the public interest. In weighing these factors, a district court must recognize that there is a correlation between an applicant's probable right, i. e. the probability of his ultimate success in enforcing or protecting the right that he asserts, and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less; but if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to warrant the grant of interim relief. More significantly:

The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. *Blackwelder*, 550 F.2d at 196.

564 F.2d at 1124.

■ The first step in considering an application for preliminary relief "is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; and if a decided imbalance of hardship should appear in plaintiff's favor, then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:

[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.

550 F.2d at 195.

■ The importance of probability of success increases as the probability of irreparable harm diminishes, and in a close case probability of success can be decisive. *Blackwelder, supra* at 195 & n.3.

■ Despite these formulations, the decision to grant or deny relief is not a rigid

or mechanistic procedure. Instead, a "flexible interplay" among the factors considered is required by *Blackwelder*. 550 F.2d at 196. A court considering an application for preliminary relief must remember that:

> The balance-of-hardship test correctly emphasizes that, where serious issues are before the court, it is a sound idea to maintain the *status quo ante litem*, provided that it can be done without imposing too excessive an interim burden upon the defendant.

550 F.2d at 194–95.

The court will now evaluate the components of the balance-of-hardship test as applied to plaintiffs' application.

### B.

*Irreparable Injury to Plaintiff Absent an Injunction*

 Before a preliminary injunction may issue, plaintiff must demonstrate that he will suffer irreparable injury if injunctive relief is denied. *Rondeau v. Mosinee Paper Co.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); *Beacon Theaters v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Blackwelder, supra* at 193, 194, 195, 196. Although this requirement is well established, the Court has never defined the term with precision. Its most recent comment came in *Sampson v. Murray, supra* where it quoted approvingly the following language from *Virginia Petroleum Jobbers Assn. v. FPC*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958):

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expanded in the absence of a stay, are not enough. The possibility that an adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

415 U.S. at 90, 94 S.Ct. at 953 *quoting* 259 F.2d at 925 (emphasis in original).

The *Blackwelder* court did not rely on this formula and instead wrote:

> Therefore, while 'irreparability' may suggest some minimum of probable injury which is required to get the court's attention, the more important question is the *relative* quantum and quality of plaintiff's likely harm. The decision to grant preliminary relief cannot be intelligently made unless the trial court knows how much the precaution will cost the defendant. If it costs very little, the trial court should be more apt to decide that the threatened injury is "irreparable" for purposes of interlocutory relief. In addition, as we have noted above, even a 'possible' irreparable injury has been held to suffice if there is a strong probability of success on the merits.

550 F.2d at 196 (emphasis in original).

 Measured by these standards, plaintiffs have not demonstrated probable irreparable injury if no injunction is granted. Plaintiff VAGC has not shown a likely injury to itself or to its members by the operation of the 10% MBE requirement. The PWEA funds have been disbursed, the project bids received, the contracts signed, and in most cases actual construction has started. This factual predicate eliminates VAGC's claim that it and its membership are suffering from the present effects of the requirement. In short, because the funds have been expended, VAGC cannot show "that there exists some cognizable danger of recurrent violation." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Likewise, plaintiff Rowland Electric Company, Inc.'s claim for injunctive relief must fail. The availability of an action for damages, the classic legal remedy, negates its claim for injunctive relief. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).

The balancing mandated by *Blackwelder* shows that plaintiffs have not demonstrated a probable irreparable injury. Their costs without an injunction are negligible,

while the costs to defendants to grant injunctive relief are considerable. Thus in quantum and quality plaintiffs have failed to show a likelihood of irreparable injury.

## C.
### Likely Injury to Defendants with an Injunction

■ The likelihood of harm to defendants with a decree would seem obvious in this case. As public officials, defendants are charged with the enforcement of a statute passed by Congress (in this case they are charged with very rapid enforcement of the law). The act which is challenged, like all acts of Congress, must be presumed constitutional. *E. g., United States v. National Dairy Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Because defendants are public officials, and not private parties, the likely injury to their constituents must be considered by the court.

The delay in enforcement of the act caused by the issuance of an injunction would thwart the congressional intent that PWEA funds be dispersed rapidly so that unemployment would be alleviated and that localities would receive badly needed construction funds. Any injunctive relief would halt the PWEA program, delay final construction of the projects, and increase unemployment. Even a limited injunction would injure the Smyth County project, and remove needed jobs from the area. Any injunction would ultimately increase completion costs for the awarded projects given present inflation rates. Defendants have demonstrated that a strong likelihood of harm exists if an injunction of any scope is granted.

## D.
### Plaintiffs' Probable Right or Likelihood of Success

■ In order to gain injunctive relief pending final disposition of their claims, plaintiffs need not demonstrate that they have an absolute right to final relief. *West Virginia Highlands Conservancy, supra* at 235; *Sinclair Refining Co., supra* at 45. Instead they need only show a "probable right" to relief. *Blackwelder, supra* at 193; *West Virginia Highlands Conservancy, supra* at 235; *Sinclair Refining Co., supra* at 45. Absent such a showing, however, no injunction can issue. *See Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

Although this formulation for obtaining relief appears minimal, the court finds plaintiffs have failed to establish the requisite showing of a right to relief to obtain injunctive relief. In this "reverse discrimination" suit the court writes upon a clean slate. Neither the Supreme Court nor any United States Court of Appeals has considered the constitutionality of the challenged statute. In fact, the Supreme Court has never ruled upon a "reverse discrimination" claim, although the already-famous *Bakke*[6] decision is imminent. Four United States District courts have ruled on the merits of plaintiffs' claims: two have held the 10% MBE requirement constitutional; two have held the requirement unconstitutional. The four opinions are equally well reasoned and written, and the court cannot select one conclusion or the other as plainly correct.

In addition, rulings from the United States Court of Appeals for the Fourth Circuit are not controlling. The most recent case from that court considering a "reverse discrimination" claim[7] is not dispositive of this case. *See Uzzell v. Friday*, 547 F.2d 801, 804 (4th Cir.), *aff'd on rehearing en banc*, 558 F.2d 727 (1977), *petition for cert. filed*, 46 U.S.L.W. 3323 (U.S. Oct. 25, 1977) (No. 77–635).

Other holdings from the Court of Appeals in Title VII cases are highly instructive but

---

6. *Bakke v. Regents of the University of California*, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted*, 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977). The case has been argued and awaits decision. *See* 46 U.S.L.W. 3249 (U.S. Oct. 18, 1977).

7. The Court of Appeals has before it another "reverse discrimination" case, *Cramer v. Virginia Commonwealth University*, 415 F.Supp. 673 (E.D.Va.1976). The case has been argued but no opinion has been issued. No. 76–1937 (4th Cir. Mar. 16, 1977).

do not alone entitle plaintiffs to relief. Plaintiffs place great reliance on three cases from the Court regarding injunctive remedies in employment discrimination cases where racial discrimination has been documented. *See White v. Carolina Paperboard Corp.,* 564 F.2d 1073 (4th Cir. 1977); *Patterson v. American Tobacco Co.,* 535 F.2d 257 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Harper v. Kloster,* 486 F.2d 1134 (4th Cir. 1973). Plaintiffs rely on these cases for the proposition that racial quotas cannot be imposed for remedial purposes absent documented, detailed findings of prior discrimination and absent a determination that no less severe method can achieve the desired result. The court finds these cases extremely helpful, but they alone do not carry plaintiffs' burden of establishing their "probable right". The court will carefully consider these cases upon a final review of plaintiffs' claims, but they do not establish a right to injunctive relief at this time.

Reliance upon general precepts of constitutional law to establish plaintiffs' "probable right" are likewise inconclusive. This failure stems from the fundamental problem of this case: how should the court characterize or classify the 10% MBE requirement; and once it has labeled it what standard of review is proper? Should it be termed a quota, a goal, or a remedial tool? Should it receive strict scrutiny, medium scrutiny, or no scrutiny from this court?

 The law of race relations and remedies is less than crystal clear. However, certain basic rules are discernable. For equal protection purposes, classifications based upon race which impose burdens or disabilities are subject to the most strict judicial scrutiny. *E. g., Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). If strict scrutiny is used, this usually means the racial classifications will be declared unconstitutional. *Cf. Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). But remedies for prior racial discrimination must consider race in order to fully eradicate the effects of previous discrimination. *E. g., North Carolina v.*

*Swann,* 402 U.S. 43, 45–46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15–21, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1968). The combination of these two doctrines means that "[t]he Constitution is both color blind and color conscious." *United States v. Jefferson County School Board,* 372 F.2d 836, 876 (5th Cir. 1966), *aff'd on rehearing en banc,* 5 Cir., 380 F.2d 385, *cert. denied sub nom. Board of Education of the City of Bessemer v. United States,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). Judge Wisdom wrote for the court that:

> To avoid conflict with the equal protection clause, a classification that denies a benefit, causes a harm, or imposes a burden must not be based on race. In that sense the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination.

380 F.2d at 385.

In addition to these considerations, commentators have argued that in "reverse discrimination" cases, where the alleged victims of racial discrimination are nonminorities, that something less than strict judicial scrutiny should be used to consider racial classifications. *E. g.,* Tribe, *American Constitutional Law* § 16–21 (1978); Brest, *Foreward: In Defense of the Antidiscrimination Principle,* 90 Harv.L.Rev. 1 (1976); Ely, *The Constitutionality of Reverse Discrimination,* 41 U.Chi.L.Rev. 723 (1974); Fiss, *A Theory of Fair Employment Laws,* 38 U.Chi.L.Rev. 235 (1971).

In light of these conflicting precedents and doctrines, the court cannot find that plaintiffs have established their "probable right" to relief. The law applicable to their claims is not settled, *see Spencer Companies, Inc. v. Armonk Industries, Inc.,* 489 F.2d 704, 706 (1st Cir. 1973), and this complex problem cannot be resolved by mechanical application of standard equal protection language. Perhaps this dilemma will be alleviated by *Bakke,* but until that

time the court cannot find plaintiffs have a "probable right" to relief.

This finding is in conformity with five district courts which have found plaintiffs failed to show they would likely succeed on the merits of their claims. *Associated General Contractors of Kansas, Inc. v. Secretary of Commerce*, Case No. 77–4218 (D.Kan. Dec. 19, 1977); *A. J. Raisch Paving Co. v. Kreps*, Civil No. 77–2497 GBH (N.D. Cal. Dec. 15, 1977); *General Building Contractors Association, Inc. v. Kreps*, No. 77–3682 (E.D.Pa. Dec. 9, 1977); *Montana Contractors' Association v. Secretary of Commerce*, CV 77–62–M, 439 F.Supp. 1331 (D.Mont.1977); *The Florida East Coast Chapter of the Associated General Contractors of America, Inc. v. Secretary of Commerce*, Case Number 77–8351–CIV.JR (S.D. Fla. Nov. 3, 1977). Admittedly, some of these courts likely employed the disapproved test of whether, "petitioner made a strong showing that he is likely to prevail upon the merits?" *Blackwelder, supra* at 193. However, the court feels there is support in these cases for its finding that plaintiffs have failed to establish their "probable right" to relief.

E.

*The Public Interest*

■ The public interest must be considered in reviewing every application for a preliminary injunction. *Blackwelder, supra* at 196; *West Virginia Highlands Conservancy, supra* at 236. Although under *Blackwelder*, the public interest is important in every case under Rule 65(a), it is often most crucial in a suit to halt enforcement of a statute. As Judge Winter wrote in *West Virginia Highlands Conservancy, supra*:

Usually the public interest comes into play when an injunction is sought to restrain enforcement of a statute or a regulation designed to further the public interest, and then it is sometimes concluded that a private party must suffer the risk of irreparable injury rather than to restrain the enforcement of that which, although it may be later determined to be invalid, is designed to further the public good.

441 F.2d at 236.

Once the court has ascertained the public interest in a suit, its powers to effectuate that interest by granting or denying injunctive relief are great. In *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1938) the Court wrote:

But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. (Citations omitted).

This is but another application of the principle, declared in *Virginian Ry. Co. v. System Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 that "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

321 U.S. at 440–41, 64 S.Ct. at 675.

■ The court feels the public interest will not be furthered by the issuance of a preliminary injunction restraining defendants from enforcing the 10% MBE requirement of the PWEA. In this case, as in many, it is difficult to ascertain where the public interest rests. *Cf. Blackwelder, supra* at 197 (clear where public interest lies). Plaintiffs claim they assert the public interest by attempting to vindicate their constitutional right to be free from racial discrimination. They assert a compelling claim to the public interest by their allegations. Conversely, defendants, government officers charged with implementation of an act of Congress, claim they represent the public interest. Both sets of parties assert basic rights fundamental to our nation—the right of every citizen to be free from racial discrimination, and the right of Congress to attempt to eradicate the continuing effects of past invidious discrimination by the passage of remedial statutes. In short, the

court cannot easily align the parties so as to place one on the side of the public interest. *Cf. Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Blackwelder, supra* at 197; *West Virginia Highlands Conservancy, supra* at 236.

The court finds the public interest rests with the defendants. They act pursuant to a presumptively constitutional law, and this court will not lightly prevent them from performing their duties as public officers. *Yakus, supra; West Virginia Highlands Conservancy, supra.* Seven United States District Courts have agreed that the public interest would not be served by the issuance of preliminary injunctions in similar suits. *Associated General Contractors of Kansas, Inc. v. Secretary of Commerce,* Case No. 77–4218 (D.Kan. Dec. 19, 1977); *A. J. Raisch Paving Co v. Kreps,* Civil No. 77–2497 GBH (N.D.Cal. Dec. 15, 1977); *Carolinas Branch, Associated General Contractors of America, Inc. v. Kreps,* Civil Action No. 77–2326, 442 F.Supp. 392 (D.S.C. Dec. 15, 1977); *General Building Contractors Association, Inc. v. Kreps,* No. 77–3682 (E.D.Pa. Dec. 9, 1977); *Ohio Contractors Association v. The Economic Development Administration,* No. C–1–77–619 (S.D.Ohio Nov. 22, 1977); *Montana Contractors' Association v. Secretary of Commerce,* CV 77–62–M, 439 F.Supp. 1331 (D.Mont.1977); *The Florida East Coast Chapter of the Associated General Contractors of America, Inc. v. Secretary of Commerce,* Case Number 77–8351–CIV.–JR (S.D.Fla. Nov. 3, 1977).

The twin goals of the PWEA, alleviation of nationwide unemployment and stimulation of the national economy by assistance to state and local governments to build badly needed public facilities, would not be fostered by the issuance of an injunction. Further, any injunction halting projects would increase their eventual cost of completion granted current inflation rates. Finally, any injunctive relief now—in midwinter would defeat the basic goal of the act—providing needed jobs during the winter. Thus, the award of an injunction now would directly injure the segment of the population which Congress sought to help—the construction industry, and especially unemployed workers.

Denial of a preliminary injunction here based upon public interest considerations is wholly consistent with the results in an earlier round of litigation concerning the PWEA. In early 1977 unsuccessful applicant cities sought injunctive relief to prevent disbursements and receipt of the Round I funds. District Courts uniformly rejected these applications, and almost every court articulated the strong public interest expressed by Congress in rapid expenditure of the funds as the prime reason for denying relief. *E. g., Town of Hope Mills v. Kreps,* No. 77–0040–Civ.–3 (E.D.N.C.1977); *Metropolitan Dade County v. Kreps,* Civil Action No. 77–1300 (D.D.C. 1977); *City of Newburgh v. Richardson,* 435 F.Supp. 1049, 1061 (S.D.N.Y.1977); *Valley Center Union School District v. United States,* Civil No. 77–127T (S.D.Cal.1977); *Clark v. Richardson,* 431 F.Supp. 105, 118–19 (D.N.J.1977); *Calaveras v. United States,* Civil No. 77–79 PEW (E.D.Cal.1977); *Narragansett v. Kreps,* Civil No. 77–57 (D.R.I.1977); *City of Benton Harbor v. Richardson,* 429 F.Supp. 1096, 1104 (W.D. Mich.1977); *Lewis v. Richardson,* 428 F.Supp. 1164 (D.Mass.1977); *City of Grand Rapids v. Richardson,* 429 F.Supp. 1087, 1087, 1095–96 (W.D.Mich.1977). In fact, this court denied injunctive relief in such a case during 1977. *County of Greene v. Kreps,* No. 77–0023(C) (W.D.Va.1977).

## X.

## CONCLUSION

Plaintiffs have failed to establish their right to injunctive relief as specified under *Blackwelder, supra.* Accordingly, plaintiffs' application for a preliminary injunction is denied. The court will contact counsel and schedule a final hearing on the merits of the case as soon as practicable. At such hearing, the court will consider pending motions for dismissal by defendants.