**R.J. REYNOLDS TOBACCO COMPANY, Plaintiff,**

v.

**PHILIP MORRIS INCORPORATED, Defendant.**

**Lorillard Tobacco Company, Plaintiff,**

v.

**Philip Morris Incorporated, Defendant.**

**Brown & Williamson Tobacco Corporation, Plaintiff,**

v.

**Philip Morris Incorporated, Defendant.**

**Nos. Civ. 1:99CV00185, Civ. 1:99CV00207 and Civ. 1:99CV00232.**

United States District Court, M.D. North Carolina.

June 29, 1999.

Order Denying Motion to Amend July 12, 1999.

Daniel R. Taylor, Jr., Kilpatrick Stockton, L.L.P., Winston–Salem, NC, Darryl R. Marsh, R.J. Reynolds Tobacco Company, Law Dept., Winston–Salem, NC, Randolph S. Sherman, Michael Malina, David S. Copeland, Eric Aaronson, Kaye, Scholer, Fierman, Hays & Handler, New York City, Richard M. Cooper, Steven R. Kuney, John E. Schmidtlein, Williams & Connolly, Washington, DC, for R.J. Reynolds Tobacco Company, plaintiff.

Larry B. Sitton, Smith Helms Mulliss & Moore, Greensboro, NC, Matthew W. Sawchak, Smith Helms Mulliss & Moore, Raleigh, NC, Robert R. Marcus, Smith Helms Mulliss & Moore, Greensboro, NC, Jerome I. Chapman, Hadrian R. Katz, Richard L. Rosen, L. Elizabeth Bowles, Amy E. Ralph, Arnold & Porter, Washington, DC, for Philip Morris Incorporated, defendant.

James T. Williams, Jr., Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, Jennifer Van Zant, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, Irving Scher, Bruce S. Meyer, August T. Horvath, Weil Gotshal & Manges, LLP, New York City, for Lorrilard Tobacco Company, plaintiff.

Norwood Robinson, Robinson & Lawing, Winston–Salem, NC, Robert B. Bell, Wiley Rein & Fielding, Washington, DC, Ronald S. Rolfe, Victor L. Hou, Cravath Swaine & Moore, Worldwide Plaza, New York City, for Brown & Williamson Tobacco Corporation, plaintiff.

## *MEMORANDUM OPINION*

BULLOCK, Chief Judge.

This matter is before the court on Plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to enjoin Defendant from implementing a retail merchandising program which allegedly violates federal antitrust and state unfair trade practice laws. The court conducted an evidentiary hearing on June 9 and 10, 1999. The parties presented witnesses and exhibits and designated affidavits for the court's consideration. After careful consideration of the exhibits, affidavits, and the testimony of witnesses, including their demeanor, opportunity to acquire knowledge of the facts about which they testified, and their interest in the case, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiffs in these consolidated actions—R.J. Reynolds Tobacco Company (Reynolds), Lorillard Tobacco Company (Lorillard), and Brown & Williamson Tobacco Corporation (B & W)—all filed complaints against Defendant Philip Morris Incorporated (PM) seeking injunctive and declaratory relief and damages for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and North Carolina General Statutes §§ 75–1, 75–2, and 75–2.1. Plaintiffs have also filed motions for a preliminary injunction against PM seeking an order enjoining PM from continuing to implement certain provisions of its "Retail Leaders" retail merchandising program.

2. Reynolds, Lorillard, and B & W are all engaged in the manufacture and distribution of cigarettes. Reynolds' primary brands include Winston, Camel, and Doral, the nation's leading discount brand. Lorillard's primary brands include Newport, the nation's second leading premium brand. B & W's primary brands include Kool and GPC. Defendant PM is also engaged in the manufacture and distribution of cigarettes. PM's primary brands include Marlboro, the nation's leading premium brand, Merit, and Basic.

3. It is undisputed that the relevant product market for the purpose of this litigation is all cigarette sales through retail outlets and that the relevant geographic market is the United States. Historically, cigarette manufacturing has been a highly concentrated industry in the United States. Recent market share figures illustrate this point. In 1998 the four leading cigarette manufacturers—PM, Reynolds, Lorillard, and B & W respectively-accounted for approximately 97% of all domestic cigarette sales.

4. In addition to being highly concentrated, the cigarette manufacturing industry is also characterized by high barriers to entry. These high barriers are evidenced by the fact that there has not been a significant new entrant into the market in over eighty years. Moreover, given the current economic, political, and regulatory environment, it is unlikely that any signifi-

cant new entrants will emerge in the foreseeable future.

5. Within this industry, PM enjoys a significant market share advantage over its competitors. In 1998 PM reported that approximately 53% of retail cigarette sales within the United States were of PM brands. This is roughly twice the market share of Reynolds, PM's next closest competitor, which had a 1998 market share of approximately 25%. B & W and Lorillard trailed PM and Reynolds with 1998 approximate market shares of 15% and 8% respectively. The gap between PM and Reynolds and B & W, its closest competitors, has steadily increased since 1993.

6. PM's leading market share position is driven primarily by its Marlboro brand, which is the dominant brand in the industry. In 1998 Marlboro sales accounted for approximately 34% of all retail cigarette sales in the United States. The next closest brands, Reynolds' Doral and Lorillard's Newport, accounted for approximately 6.4% and 5.8% of the market respectively.

7. The market for retail cigarette sales is diminishing as the population of adult smokers decreases. Thus, in competing with each other, cigarette manufacturers seek to maintain brand loyalty with respect to their existing customers while also inducing purchases by adult smokers of other manufacturers who occasionally buy different brands, or who do not have a usual brand preference at the time of purchase. While most adult smokers claim to have a "usual" brand, a significant percentage of adult smokers buy other brands on an "occasional" basis. Moreover, over time adult smokers who are loyal to a particular brand switch to a different usual brand. In the last two years, approximately 6 million adult smokers, representing approximately 14% of that population, have switched their usual brand.

8. The competition for switchers and occasional use purchasers occurs primarily in so-called pack outlets, which are comprised of convenience stores and gas stations, where approximately 60% of all cigarettes are sold. This is because adult smokers are more likely to purchase a non-usual brand by the pack rather than by the carton.

9. In the competition for brand loyalty, product visibility and advertising at the point of purchase are essential to remaining competitive. Visibility and advertising at the point of purchase are critical to both the development and maintenance of a particular brand equity and also to price and promotional competition among manufacturers.

While visibility and advertising are important in most if not all product categories in the retail store environment, they are uniquely critical in the cigarette industry. First, unlike other product categories sold in the convenience store/grocery store environment, cigarette manufacturers face severe limitations with respect to advertising. Television and radio have long been off limits to cigarette manufacturers. Moreover, as a result of the recent tobacco litigation settlements, outdoor advertising on billboards, distribution of logoed merchandise, and advertising at sports and other public events have also been severely limited or entirely eliminated. Cigarette manufacturers are thus left with only three basic channels to communicate with adult smokers: print media, direct mail, and the point of purchase.

A further unique aspect to the cigarette industry is that because of concern about youth smoking there has been a recent shift in display space locations at the point of sale from self-service, counter-top displays to a non-self-service, back bar display behind a sales counter. In this environment, a customer approaches a counter and asks the clerk for the pack or carton of his choice from the display fixture on the back bar. Counter-top, end-of-aisle, or other self-service type displays that are often used in other categories, such as soda or snacks, are, for the most part, no longer available to cigarette manufacturers. For example, eight states and hundreds of municipalities have already

banned self-service displays and numerous other states are considering similar prohibitions. Thus, a manufacturer who cannot obtain quality display space on the back bar fixture will not be able to compensate by purchasing, for example, an end-of-aisle type display.

Another characteristic of the back bar environment is that approximately half of the display space available to the cigarette category will be below counter level and therefore out of the consumer's primary line of sight. In the past, when self-service counter-top displays were the customary method of displaying the category, the entire display space for the cigarette category was generally either on the counter-top or in above-counter displays on the back bar. In either location a manufacturer could easily communicate its brand equity and price message to the consumer. In contrast, the new back bar fixtures typically rise from the floor to a height of six-to-eight feet. The display space on the lower half of the fixture is often obstructed by the sales counter, making it difficult for manufacturers on the lower half of the fixture to communicate brand equity and price messages.

10. The critical importance of brand visibility and display space at the point of purchase in the cigarette industry is not disputed. It is evidenced by the fact that all four of the major manufacturers involved in this litigation have vigorously competed with each other for in-store display space and advertising through the payment of retail display allowances (RDA's). Because of the significance of pack outlets in the competition for brand loyalty and occasional use purchases, manufacturers have usually offered greater RDA's to pack outlets as compared with predominantly "carton outlets" such as supermarkets and cigarette and tobacco stores.

These RDA payments are essential to a pack outlet's ability to compete in a cigarette category. Excluding the sale of gas, cigarette sales represent perhaps the most important product category to convenience stores and gas stations. For example, Jack Barger, Chief Operating Officer of Morgan Oil Co., which operates twenty-two convenience stores in western North Carolina under the trade name "Convenience King," testified that cigarette sales represent 30% of his company's product sales.

The RDA payments from cigarette manufacturers are typically passed on to consumers in the form of price discounts. Thus, a retailer under a contract receiving RDA payments from PM will be able to offer consistently lower prices on PM brands such as Marlboro than a retailer who is not under contract. Moreover, because the cigarette category is so important to pack outlets and because the Marlboro brand is dominant in the category, a pack outlet receiving little or no RDA allowances from PM will not be able to compete in the cigarette category with pack outlets receiving substantial RDA's from PM. Inability to compete in the cigarette category, in turn, makes it unlikely that convenience stores or gas stations will be able to survive in the market place given the significance of cigarette sales to their business.

12. In or about October 1998, PM announced that it was implementing "Retail Leaders," a new retail merchandising program to replace its "Retail Masters" program, which had been in existence since 1992. After a transitional period, during which participating retailers could be under either a Retail Leaders or Retail Masters contract, the Retail Masters program was to be terminated. The termination date for Retail Masters was originally March 31, 1999, but has since been extended by PM until June 30, 1999. Although certain isolated provisions from the Retail Masters program are carried over to the Retail Leaders program, there are important aspects of the Retail Leaders program which distinguish it from Retail Masters.

First, the prior Retail Masters program included participation levels which enabled

retailers to obtain significant promotional discounts from PM while still enabling them to negotiate promotional agreements with at least two competing manufacturers. With opportunities for at least three manufacturers to obtain significant in-store visibility and signage, all Plaintiffs had an effective opportunity to compete at the point of sale. In contrast, under Retail Leaders, there is a strong likelihood only one competing manufacturer will be able to obtain above-counter display space and signage. This is because the promotional payments are structured so that nearly all retailers will choose to sign a Retail Leaders contract at a level of participation, known as a "category performance level" (CPL), which will leave above-counter display space for only one or two competing brands. Retail Leaders has four CPL's, known as CPL Base, CPL 1, CPL 2, and CPL 3. However, the disparity between the promotional payments at CPL Base and CPL 1, on the one hand, and CPL 2 and CPL 3 on the other means that the retailers' only viable choice is to sign on at CPL 2 or CPL 3. As Jack Barger credibly explained, it will be a competitive necessity for pack outlets to sign a Retail Leader contract at CPL 2 because they cannot survive without the PM promotional payments offered at that level. Barger's testimony is supported by the fact that, of all the Retail Leaders contracts entered into to date, all but 1% to 2% have signed on at CPL 2 or CPL 3.

Second, at these higher levels of Retail Leaders, PM introduces a so-called "industry fixture" which is to be placed in the best display position in the store. Ordinarily this will be on the back bar behind a primary cash register. At CPL 2 the industry fixture must occupy 50% of the total display space for the cigarette category. PM brands are required to be placed on the top half of the industry fixture loaded horizontally, assuming a PM market share of 50%. Moreover, only PM can place permanent signage on the industry fixture. Thus, Retail Leaders would prohibit a retailer from entering into an agreement with a competing manufacturer

to place a permanent sign on that manufacturer's own portion of the industry fixture.

At CPL 2 the remaining 50% of display space will ordinarily be divided into two additional fixtures. The first fixture, known as the PM "prime" fixture, will constitute approximately 25% of the overall space. Only PM brands and signage may be displayed on the prime fixture. The prime fixture must be placed in the second best visibility location. The last fixture, known as the "retailer's choice" fixture, will occupy the remaining 25% of the category space. The retailer can display competing manufacturers' brands and signage in this location.

The practical effect of the industry fixture at CPL 2 is to provide PM with 75% of the above-counter display space and 75% of the permanent in-store signage, percentages well in excess of its market share. This will likely leave above-counter display space for perhaps one or two competing brands at most. While PM includes below-counter space in calculating its market-share-to-shelf-space percentages to conclude that it is only asking for its market share, PM's vice president of trade/marketing, Barry Hopkins, conceded at the evidentiary hearing that he would not pay for below-counter "display" space.

The industry fixture also allows PM to regulate how a competitor may display and advertise its own brand in its own space on the industry fixture. Thus, PM is not simply paying for the best display space for its own brands, but also exercising unprecedented control over how competitors may advertise and display their own brands.

At CPL 3 the industry fixture accounts for 100% of the category display space. Thus PM demands 100% of the above-counter display space and 100% of the permanent in-store signage. Moreover, competitors are not allowed to purchase permanent signage to place on their respective portions of the industry fixture. Nevertheless, while there is substantial ev-

idence in the record which indicates that most retailers will have no economic choice other than to sign a CPL 2 contract, there is no evidence that, as between CPL 2 and CPL 3, retailers will be coerced into choosing CPL 3.

13. By its own estimates, PM expects approximately 75% of its total sales volume to be generated through stores under a Retail Leaders contract which, as noted, will almost always be at CPL levels 2 or 3. Also as noted, the vast majority of these contracts will be at CPL 2.

14. Retailer response to the Retail Leaders program has been slow during the current transitional period between Retail Masters and Retail Leaders. Barger, whose Convenience King chain of stores is currently under a Retail Masters contract, testified that this was because the promotional structure of the Retail Leaders program was going to compel Convenience King to enter into a Retail Leaders contract at CPL 2, which would force him to abandon his current relationship with B & W. Barger stated that he has tried to obtain concessions from PM that would enable Convenience King to maintain its relationship with B & W, but had been unsuccessful. For example, B & W had agreed to pay for a permanent sign to be placed on its portion of the industry fixture, but PM refused to allow the sign. Thus, Barger is waiting until the Retail Masters program expires on June 30, 1999, before signing on to a Retail Leaders contract.

15. The Retail Leaders program is likely to be particularly devastating to B & W and Lorillard as they will presumably be the "odd man out" at the point of purchase. Lorillard, for example, has already lost approximately 4,000 promotional contracts with retailers due at least in part to the impact of Retail Leaders. It is noteworthy that in the Retail Masters environment, Lorillard was routinely able to obtain counter-top displays at the point of purchase for its Newport brand, the second-leading premium brand in the country. In the Retail Leaders environment, howev-er, Lorillard's Newport brand will be shifted to a location near the floor behind the counter.

16. Other than minor short-term difficulties, PM has not presented any evidence that it will be significantly harmed by the issuance of an injunction. Barry Hopkins, PM's vice president of trade and marketing, admitted that he had not given much thought about a contingency plan in the event that this court entered an injunction. PM's only significant source of identified harm would result only if this court ordered it to not require that its product be shelved horizontally. Such an order would force PM to go back and re-shelve product in the approximately 20,000 stores already signed to Retail Leaders contracts. PM presented no evidence that allowing competitors to place permanent signage in their respective portions of the industry fixture, or allowing competitors to contract for permanent signage and temporary signage at other locations in the store, subject to PM being allowed to maintain corresponding signage at its market share levels, would disadvantage PM in the market place or adversely affect PM's advertising opportunities, brand goodwill, or market share.

## DISCUSSION

■ A preliminary injunction is an extraordinary remedy and the court should grant such relief only when a plaintiff clearly establishes entitlement to such relief. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.1991). In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir.1977), the Fourth Circuit identified the four factors, known as the balance of hardships test, which must be analyzed in determining whether to issue a preliminary injunction. These factors are: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with the injunction; (3) the plaintiff's likelihood of success on the mer-

its; and (4) the public interest. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048, 1054 (4th Cir. 1985).

■ Under the *Blackwelder* test a plaintiff must first make a clear showing that it will suffer irreparable harm without the injunction before any other inquiry is made. *Direx,* 952 F.2d at 812. If the plaintiff makes a clear showing of irreparable harm, the court must then balance the likelihood of irreparable harm to plaintiff without the injunction against the likelihood of harm to the defendant if the injunction is issued. *Blackwelder,* 550 F.2d at 195.

■ After balancing the hardships, the court then proceeds to evaluate the plaintiff's likelihood of success on the merits. The balancing of hardships step must precede evaluation of the likelihood of success on the merits because

> the outcome of the hardship test fixes the degree of proof required for establishing the likelihood of success by the plaintiff. If the hardship balance tilts sharply and clearly in the plaintiff's favor, the required proof of likelihood of success is substantially reduced. Similarly, if the hardship to plaintiff is minimal or non-existent ... then the burden on the plaintiff to establish likelihood of success on the merits becomes considerably greater.

*Direx,* 952 F.2d at 817. In particular, where "the balance 'tips decidedly' in favor of the plaintiff ... a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation.'" *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991) (citations omitted). As the balance of hardships shifts away from the plaintiff, a higher threshold showing on the merits is required. *Id.* Thus, where the plaintiff fails to establish that the balance tips decidedly in its favor, the plaintiff must make a strong showing of likelihood of success,

establish a substantial likelihood of success, or present clear and convincing evidence of success. *See Direx,* 952 F.2d at 818.

Finally, Plaintiff must establish that the public interest favors the issuance of a preliminary injunction. However, this factor "does not appear always to be considered at length in preliminary injunction analysis" and is rarely determinative. *Rum Creek Coal Sales,* 926 F.2d at 366.

■ Plaintiffs have made a clear showing of irreparable injury in the absence of injunctive relief. In particular, as found above, Plaintiffs have demonstrated that PM's control of display space and signage under Retail Leaders will cause all Plaintiffs to suffer irreparable injury in the form of lost goodwill and lost advertising opportunities, and incalculable harm to their respective competitive positions, including threatened loss of market share and threatened loss of existing and potential customers. These types of injury or threatened injury have all been held to satisfy the irreparable injury requirement. *See, e.g., Philip Morris Inc. v. Pittsburgh Penguins, Inc.,* 589 F.Supp. 912, 920 (W.D.Pa.1983), *aff'd mem.,* 738 F.2d 424 (3d Cir.1984) (plaintiff prevailed on a preliminary injunction motion against the defendant's threatened removal of cigarette advertising displays because the loss of potential customers who would be persuaded by the advertising was a loss which could not be calculated in money damages); *see also Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir.1994) ("when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill the irreparable injury prong is satisfied"); *Medtronic, Inc. v. Catalyst Research Corp.,* 664 F.2d 660, 663 (8th Cir.1981) (loss of market share constituted irreparable injury).

PM will not suffer any substantial hardship if an injunction is issued. PM's current marketing vice president Barry Hop-

kins cited concerns only about short-term "administrative chaos" associated with having to send out representatives into retail stores already on Retail Leaders contracts in order to re-stack the display fixtures. Hopkins did not assert that PM would suffer any long-term harm or that its brands would suffer lost market share, goodwill, or brand equity dilution. Thus, the court concludes that, on balance, the hardships tip decidedly in Plaintiffs' favor. Indeed, in the absence of the re-shelving issue, the balance tips overwhelmingly in favor of Plaintiffs.

Because Plaintiffs have established that the balance of hardships tips decidedly in their favor, Plaintiffs must establish only that a serious and substantial question exists with respect to the merits. *See Merrill Lynch, Pierce, Fenner & Smith,* 756 F.2d at 1055. The court finds that Plaintiffs have established that a serious and substantial question does exist with respect to their Section 1 claim.[1]

■■ The Retail Leaders program is a vertical restraint and its legality under Section 1 should be analyzed under a traditional rule of reason standard. *See Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,* 889 F.2d 524, 527 (4th Cir.1989). Establishing a Section 1 violation proceeds in three steps: (1) the plaintiff must carry the initial burden of showing the challenged conduct has "an actual adverse effect on competition as a whole in [a] relevant market"; (2) the defendant must then demonstrate that its conduct has "pro-competitive 'redeeming virtues'"; and (3) even if the defendant sustains that burden the plaintiff can still prevail by showing that the same pro-competitive benefit "could be achieved through an alternative means that is less restrictive of competition." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir.1995) (citations omitted).

With respect to the first step, the Fourth Circuit has held that "[a] threshold inquiry ... is whether the defendant has market power" in the relevant product and geographic markets. *Murrow Furniture Galleries,* 889 F.2d at 528. As noted, the parties agree that the relevant product and geographic markets in this case is the retail sale of cigarettes in the United States.

As for market power, the court finds that Plaintiffs have raised a serious question as to whether PM has market power. The Supreme Court has indicated that market power for Section 1 purposes is a lesser degree of power than necessary to prove a Section 2 offense of monopolization. *See Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Here, PM's market share in excess of 50%, combined with the dominant presence of its Marlboro brand, the concentrated nature of the industry, and high barriers to entry, raises a serious question as to whether PM possesses market power. The Retail Leaders program itself is an indication of PM's market power. By structuring RDA payments in such a way as to prevent non-CPL 2 or 3 outlets from effectively competing with CPL 2 or 3 outlets on PM brands, including Marlboro, PM will obtain a minimum of 75% of the above-counter display space and in-store signage, a figure well in excess of its market share and likely to cause significant and incalculable harm to Plaintiffs. As Plaintiffs' economic expert Professor George Hay explained,

The Retail Leaders program is a classic example of market power to gain a significant competitive advantage by handicapping rivals and diminishing their ability to compete. The [Retail Leaders] program is compelling to retailers precisely because of PM's existing dominance. No firm without PM's dominant market share could hope to succeed in making significant numbers of retailers accept a similar program. Yet few re-

---

1. Because the court finds a serious question with respect to Plaintiffs' Section 1 claim, it will not discuss Plaintiffs' Section 2 claim or state law claims.

tailers can afford *not* to enroll in the PM Leaders Program as long as their competitors are doing so. Because the cost of not signing up is that virtually all PM promotional monies and other benefits will be withdrawn, the pressure to accept the program is clear-retailers who do not enroll in the PM Retail Leaders program will not be able to compete with other retailers who are receiving promotional discounts on Marlboro and the other PM brands. Further, there is no viable fallback option for a retailer that wants to work with several of the other major manufacturers and allow each a degree of visibility roughly commensurate with presence in the market. PM is thus using market power to confront retailers with the 'choice' of CPL 2 or 3 on the one hand and nothing on the other. And it is doing so in order to demand a share of the visible retail space that is likely to have a dramatic impact on the ability of its rivals to compete effectively.

(Hay Decl. ¶ 25).

Because Plaintiffs seek an injunction prior to full implementation of the Retail Leaders program, Plaintiffs obviously cannot show an actual adverse effect on competition and must instead satisfy this burden by establishing that PM possesses market power "plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anti-competitive nature of the defendant's behavior or the structure of the interbrand market." *Tops Mkts. Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir.1998). The court has already found that Plaintiffs have raised a serious question as to PM's market power. The court also finds that Plaintiffs have raised a serious question as to the anti-competitive effect of Retail Leaders. In particular, Retail Leaders poses a serious threat to interbrand competition by severely limiting and regulating in-store displays and advertisements of competing manufacturers. It also appears that Retail Leaders will have an adverse effect upon consumer choice.

As for the redeeming pro-competitive virtues of Retail Leaders, PM has offered none. Indeed, James Mortensen, the former vice-president of marketing at PM, could not identify any justification for PM's exclusion of competitive permanent signage on the industry fixture. Vertical restraints relating to display space and advertising at the point of purchase are often viewed as pro-competitive because they enhance interbrand competition, even though they may inhibit intrabrand competition. *See, e.g., Jays Foods, Inc. v. Frito–Lay, Inc.*, 664 F.Supp. 364 (N.D.Ill.1987), *aff'd mem.*, 860 F.2d 1082 (7th Cir.1988), *cert. denied*, 489 U.S. 1014, 109 S.Ct. 1125, 103 L.Ed.2d 188 (1989); *Frito–Lay, Inc. v. Bachman Co.*, 659 F.Supp. 1129, 1134 (S.D.N.Y.1986). This is because interbrand competition, and not intrabrand competition, is a primary concern of antitrust law. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

Earlier cases involving shelf space agreements are readily distinguishable from this case, however, in that a serious question as a defendant's power to coerce retailers was not present in those cases. Moreover, visibility and advertising at the point of purchase are uniquely critical to competition in the cigarette industry as competitors lack significant alternative advertising channels to compensate for the lack of visibility at the point of purchase. Thus, even if the "interbrand competition" rationale was offered by PM, there is a significant likelihood in this case that Retail Leaders will have the effect of stifling interbrand competition, not enhancing it. Accordingly, the court concludes that Plaintiffs have, at a minimum, raised a serious question as to their threshold burden of demonstrating an anti-competitive effect of the Retail Leaders program. The court further concludes that a serious question exists as to whether PM can satisfy its burden of establishing pro-competitive benefits which offset the anti-competitive effect. Even if PM could establish pro-competitive benefits, there is a serious

question as to whether Retail Leaders exceeds what is reasonably necessary to achieve any legitimate pro-competitive objective.

Finally, the court will consider the public interest. As previously noted, the public interest factor is seldom discussed at length in preliminary injunction analysis. *Rum Creek Coal Sales,* 926 F.2d at 366. Plaintiffs contend that the public interest favors it because it is suing to vindicate the public's interest in effective enforcement of antitrust laws which, in turn, advance competition in the marketplace. Defendant contends that the public interest favors it because Plaintiffs are attempting to utilize this court to obtain a competitive advantage it could not achieve in the marketplace. The court does not find that the public interest factor alters the conclusion drawn from analysis of the other factors. Each side asserts that they are aligned with the public's interest in a competitive marketplace. "In this case, as in many, it is difficult to ascertain where the public interest rests.... Both sets of parties assert basic rights fundamental to our nation.... In short, the court cannot easily align the parties so as to place one on the side of the public interest." *Virginia Chapter, Associated Gen. Contractors v. Kreps,* 444 F.Supp. 1167, 1185–86 (W.D.Va. 1978).

## CONCLUSIONS OF LAW

1. The Retail Leaders program will cause all Plaintiffs to suffer irreparable harm in the form of loss of advertising opportunities, goodwill, brand equity, and the potential for permanent loss of customers.

2. The issuance of an injunction will not cause Defendant to suffer any significant harm to its advertising opportunities, market share, goodwill, or brand equity. The potential for any significant harm to PM can be obviated by not requiring PM to reshelve its product vertically as opposed to horizontally.

3. The balance of hardships tips decidedly in favor of Plaintiffs.

4. Plaintiffs have raised a substantial and serious question as to the merits of their claim under Section 1 of the Sherman Act. In particular, Plaintiffs have raised a serious question as to PM's market power and as to whether Retail Leaders will have an anti-competitive effect on the interbrand market which will outweigh any pro-competitive benefits of the program.

5. While fair and vigorous competition is in the public interest, this factor does not substantially affect the court's determination that it is appropriate to enter a preliminary injunction in this case.

## CONCLUSION

For the foregoing reasons, the court will grant Plaintiff's joint motion for a preliminary injunction [Doc. #2 in RJR 1:99CV185; Doc. #2 in Lorillard 1:99CV207; and Doc. #2 in B & W 1:99CV232].

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

## *ORDER*

This matter is before the court on the joint motions of Plaintiffs R.J. Reynolds Tobacco Company ("Reynolds") and Lorillard Tobacco Company ("Lorillard") to amend this court's June 29, 1999, order and preliminary injunction (the "Order") and to shorten time for Defendant to respond to the motion to amend.

In particular, Reynolds and Lorillard seek to add an additional prohibition to the preliminary injunction which would prohibit Philip Morris Incorporated ("PM") from requiring: "in any CPL 2 retail outlet that has not as of June 29, 1999, loaded its display fixtures in compliance with PM's Leaders contract to allocate to PM any space on any fixture displaying packages (i.e., packs or cartons) of cigarettes horizontally rather than vertically." (Reynolds' and Lorillard's Mem. at 2). In requesting this relief, Reynolds and Lorillard focus on the court's finding that, assuming

a fifty per cent (50%) market share, CPL 2 provides PM with approximately seventy-five per cent (75%) of the above counter display space. (See Mem.Op. at 10). However, Reynolds and Lorillard overlook the fact that the court found that Plaintiffs would suffer irreparable injury at the CPL 2 level as the result of PM's unprecedented control over display space and signage or other advertising at the point of purchase, not because of PM's control of display space alone.

The court drafted the preliminary injunction in such a way as to allow Plaintiffs to compensate for their display space disadvantage by: (1) allowing them the opportunity to bid for permanent signage on their portions of the industry fixture; (2) adjusting the permanent signage calculations in CPL 2 contracts to allow Plaintiffs to bid for a greater overall percentage of in-store signage; and (3) otherwise prohibiting PM from restricting Plaintiffs' ability to advertise or conduct promotional programs. (See Order at 2). In other words, in drafting the preliminary injunction, the court sought to maintain a competitive balance at the point of purchase with respect to display space and advertising which would allow Plaintiffs an opportunity to compete without unduly interfering with PM's ability to conduct its Retail Leaders retail merchandising program.

Because it is not in the interests of justice or of the parties to prolong the uncertainty among the parties about their respective merchandising programs, the court will not await a response from PM to Reynolds' and Lorillard's joint motion to amend and will dismiss Reynolds' and Lorillard's joint motion to shorten the time for PM to respond as moot.

NOW, THEREFORE, IT IS ORDERED that Reynolds' and Lorillard's joint motion [Doc. # 66 in RJR 1:99CV00185; Doc. # 51 in Lorillard 1:99CV00207] to amend this court's June 29, 1999, order and preliminary injunction is **DENIED**. IT IS FURTHER ORDERED that Reynolds' and Lorillard's joint motion [Doc. # 68 in RJR 1:99CV00185; Doc. # 53 in Lorillard 1:99CV00207] to shorten the time for PM to respond is **DISMISSED** as moot.