Bayer Cropscience LP v. Chemtura Corp., 2012 NCBC 40.

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF DURHAM               12 CVS 3057

| | | |
|---|---|---|
| BAYER CROPSCIENCE LP,<br>        Plaintiff | ) <br> ) <br> ) | |
| v. | ) <br> ) | **OPINION AND ORDER ON MOTION<br>FOR PRELIMINARY INJUNCTION** |
| CHEMTURA CORPORATION,<br>        Defendant | ) <br> ) | |

THIS CAUSE, designated a complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Chief Superior Court Judge for Complex Business Cases, is before the court for determination of Plaintiff Bayer CropScience LP's Motion for a Preliminary Injunction ("Motion"), pursuant to Rule 65, North Carolina Rules of Civil Procedure ("Rule(s)"); and

THE COURT, having considered the Motion, briefs in support of and in opposition to the Motion, submissions and arguments of counsel and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED, for the reasons stated herein.

*Womble Carlyle Sandridge & Rice, LLP, by Pressly M. Millen, Esq. and Robert T. Numbers, II, Esq. for Plaintiff.*

*Kilpatrick Townsend & Stockton, LLP, by Gregg E. McDougal, Esq. and Alan D. McInnes, Esq. for Defendant.*

THE COURT makes the following FINDINGS of FACT, only for the limited purpose of determining the Motion:

[1]     Plaintiff Bayer CropScience LP ("Bayer") is a Delaware limited partnership with its principal place of business in Durham County, North Carolina.[1]

[2]     Defendant Chemtura Corporation ("Chemtura") is a Delaware corporation with its principal place of business in Middlebury, Connecticut.[2]

[3]     On or about March 31, 2008, Bayer and Chemtura entered into an agreement entitled Second Amended and Restated Ipconazole Development and Supply Agreement ("Chemtura Agreement").[3] The initial term of the Chemtura Agreement runs until June 20, 2015.[4] However, either party can terminate the agreement if the other party is in material breach and fails to cure such breach within thirty days after being notified, with reasonable particularity, of the breach.[5]

[4]     Under the Chemtura Agreement, Chemtura granted Bayer the exclusive right to use the chemical Ipconazole[6] to develop certain formulated products, notably the Vortex Formulation ("Vortex").[7] Vortex primarily was to be used as a seed treatment on corn (including popcorn and sweet corn), cotton, sorghum, peanuts, sunflower, vegetables and sugar beets in the United States.[8] Bayer's Canadian affiliate also was granted the right to use Ipconazole to develop a Canadian formula, similar to Vortex, as a seed treatment on corn (including popcorn and sweet corn) in Canada.[9]

---

[1] Compl. Inj. Relief ("Complaint") ¶ 1.
[2] *Id.* ¶ 2.
[3] *Id.* ¶ 5.
[4] Chemtura Agreement § 1.1. The Chemtura Agreement could be renewed for additional one-year terms with consent of both parties. *Id.*
[5] *Id.* § 12.1(a).
[6] Ipconazole is a fungicide, applied to certain crop seeds to protect plants from soil and seed borne diseases. Compl. ¶ 6.
[7] Chemtura and Bayer's predecessor-in-interest worked together to develop Vortex. The active ingredient used in Vortex is Ipconazole. Sutton Aff. 1.
[8] Chemtura Agreement § 2.2. Chemtura obtained its rights in Ipconazole by entering into an exclusive agreement with Kureha Chemical Industry Co., Ltd., the supplier of Ipconazole. Sutton Aff. ¶ 3.
[9] Chemtura Agreement § 2.2.

[5]     Chemtura's performance under the Chemtura Agreement is conditioned on Bayer's satisfactory performance of a list of obligations, along with Bayer's obligation to purchase a required annual quantity of Ipcanazole.[10]  The relevant portions of Bayer's obligations under the Chemtura Agreement, for purposes of this Opinion and Order, are reflected in sections 3.1(a) and (c), 9.4 and 16.1.[11]  These sections provide that:

> 3.1(a): Bayer shall use commercially reasonable efforts to develop the market potential for the use of [Ipconazole] for [Vortex] and for approved [new uses] on [crops] in the [United States and Canada].[12]
>
> 3.1(c): Bayer shall use commercially reasonable efforts to fully promote the sales and use of [Vortex] and approved [new uses] for crops in the [United States and Canada], by engaging in advertising and marketing programs.[13]
>
> 9.4: [Vortex] and any approved [new uses] shall be sold by Bayer and/or Bayer's [Canadian affiliate], as applicable, under their own labels and trademarks or trade names (including "Vortex") for [seed treatment use on crops in the United States and Canada.]  Under no circumstances shall Bayer or Bayer's [Canadian affiliate] make any warranty, express or implied, to any person with respect to the [Ipconazole].[14]
>
> 16.1:  .  .  .  [T]his [Chemtura] Agreement shall not be transferred or assigned, by operation of law or otherwise, by Bayer without Chemtura's prior written consent.[15]

[6]     As part of the Chemtura Agreement, Chemtura permitted Bayer to submit Chemtura's data and information to the United States Environmental Protection Agency ("EPA") so that Bayer could receive the proper approval and registration needed to

---

[10] *See id.* §§ 3.1, 6.1.
[11] As discussed *infra*, sections 3.1(a) and (c), 9.4 and 16.1 were cited by Chemtura in a notice to Bayer setting forth Bayer's alleged default under the Chemtura Agreement.
[12] *Id.* § 3.1(a).
[13] *Id.* § 3.1(c).
[14] *Id.* § 9.4.
[15] *Id.* § 16.1.

manufacture Vortex and apply it to certain crop seeds.[16] Without Chemtura's data and information, Bayer would not be able to manufacture and sell Vortex because Bayer would not be able to receive EPA approval.[17]

[7] On or about April 7, 2008, Bayer entered into an agreement ("Monsanto Agreement") with Monsanto Company ("Monsanto"), which, among other things, produces corn seeds and treats its corn seed with fungicidal treatment.

[8] Pursuant to the terms of the Monsanto Agreement, Bayer granted Monsanto the exclusive right to purchase Vortex for use as a seed treatment for Monsanto's corn seeds.[18] Notwithstanding the Monsanto Agreement, Bayer remained obligated to Chemtura for performance of all the material terms of the Chemtura Agreement.

[9] As part of a separate agreement entered into on May 26, 2009, Bayer permitted Monsanto to obtain supplemental registration from the EPA for Vortex so that Monsanto could develop and use its own trademarks for the sale of Vortex.[19] However, Bayer continued to sell Vortex to Monsanto for use on corn seed using Bayer's own trademarks and trade names.[20]

---

[16] Compl. ¶ 9.
[17] May Aff. ¶¶ 8-10. The Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. §§ 136 *et seq.*, generally provides for the federal regulation of covered chemical products, including registration and labeling requirements necessary for the legal sale and use of such products in the United States. As mentioned above, without such registrations, Vortex, and other regulated products, may not be sold.
[18] While negotiating the Monsanto Agreement, Monsanto informed Bayer that it required Bayer to grant Monsanto the exclusive right to purchase Vortex from Bayer with respect to its use on corn seed as a condition to entering into the Monsanto Agreement. Rick Turner Aff. ¶ 7.
[19] Corn Seed Treatment Supplemental Registration Agreement ¶¶ B-C, § 2.5.
[20] May Aff. ¶ 5.

[10]    Given the consolidated nature of the commercial corn seed industry, increasing sales and market potential for a product such as Vortex is difficult.[21]  There is evidence before the court that an exclusive agreement with Monsanto, which is the largest corn seed producer in the United States, is likely to produce greater sales and potential future growth opportunities for Vortex versus targeting sales to smaller corn seed producers that did not include sales to Monsanto.  Additionally, Bayer's contractual relationship with Monsanto represents a source for potential growth regarding Vortex with respect to other crop seeds.[22]

[11]    Bayer and Monsanto published a news release dated April 8, 2008, announcing the Monsanto Agreement.[23]  On April 24, 2008, Bayer and Chemtura conducted a meeting.  The meeting agenda listed the Monsanto Agreement as one of the items to be discussed.[24]  At this meeting, Bayer provided Chemtura with an overview of the Monsanto Agreement and explained the exclusive aspect of the agreement.[25]

[12]    On March 15, 2012, approximately four years after Bayer entered into the Monsanto Agreement, Chemtura notified Bayer by letter ("Notice") that it believed Bayer materially breached the Chemtura Agreement by entering into the Monsanto Agreement and granting Monsanto the exclusive right to purchase Vortex in the United States for

---

[21] The commercial corn seed market is dominated by Monsanto and Pioneer.  Rick Turner Aff. ¶ 4. Roughly, Monsanto controls 35% of the United States market, with Pioneer controlling 34%.  *Id.* Syngenta is less of a factor, controlling 7% of the same market.  However, Syngenta produces its own fungicide for seed treatment, which it uses on its own corn seeds and provides it to Pioneer pursuant to a long-term agreement.  *Id.* ¶ 5.
[22] There is evidence that Bayer and Monsanto could expand their current contractual relationship to include the application of Vortex on Monsanto's cotton and soybean seeds.  Mark Turner Aff. ¶¶ 6-7.
[23] May Aff. ¶ 4.
[24] *Id.*
[25] Smith Aff., Ex. B.

use as a seed treatment on corn.[26] Specifically, the Notice stated that Bayer's exclusive grant of rights to Monsanto violated sections 3.1(a), 3.1(c) and 9.4 of the Chemtura Agreement.[27] Further, the Notice stated that because Bayer transferred certain material obligations to Monsanto, Bayer was also in breach of section 16.1 of the Chemtura Agreement, which permits assignments of obligations only with Chemtura's prior written consent.[28] The above-referenced sections were the only sections that the Notice referenced as a source for Bayer's alleged default.[29]

[13]   In the Notice, Chemtura indicated its intent to terminate the Chemtura Agreement, unless the alleged breach was cured within thirty days.[30]

[14]   On April 12, 2012, Bayer responded to the Notice and informed Chemtura that it had not manifested an intention to transfer its obligations under the Chemtura Agreement to Monsanto or to any other party and contended that it was not in material breach of the Chemtura Agreement.[31]

[15]   On April 24, 2012, Chemtura rejected Bayer's explanation and stated that it intended to terminate the Chemtura Agreement on April 30, 2012.[32] Chemtura indicated that it would cease selling Ipconazole to Bayer in an exclusive arrangement.[33] Chemtura also demanded that Bayer either terminate its registration for Vortex with the EPA or transfer the registration to Chemtura.[34]

---

[26] Sutton Aff. ¶ 22, Ex. B.
[27] *Id.*, Ex. B.
[28] *Id.*
[29] *See id.*
[30] *Id.*
[31] Millen Aff., Ex. 5.
[32] *Id.*
[33] *Id.*
[34] *Id.*

[16]     On April 30, 2012, Chemtura purportedly terminated the Chemtura Agreement.[35]

[17]     From the time the Chemtura Agreement was entered into until the time of Chemtura's purported termination, Bayer purchased over $15 million worth of Ipconazole from Chemtura.[36]  This sales volume represents a significant increase over the amount of Ipconazole Chemtura sold in the years prior to the Chemtura Agreement.[37]

[18]     Losing its exclusive rights to sell Vortex in the United States and Canada, as well as its EPA registration, would prevent Bayer from being able to perform its contractual obligations to Monsanto.[38]  Such a loss would cause material monetary harm to Bayer that would be difficult, if not impossible, for Bayer to quantify.[39]

[19]     On May 10, 2012, Bayer filed its Complaint for Injunctive Relief alleging the following claims for relief ("Claim(s)"): First Cause of Action – Breach of Contract and Second Cause of Action – Declaratory Judgment.  Bayer seeks preliminary injunctive relief as a result of Chemtura's alleged unjustified, unilateral termination of the Chemtura Agreement.

[20]     The Motion has been briefed and argued and is ripe for determination.

BASED UPON the foregoing FINDINGS of FACT, the court reaches the CONCLUSIONS of LAW reflected in the following discussion:

---

[35] *Id.*
[36] Mark Turner Aff. ¶ 3.
[37] *Id.* ¶ 4.
[38] May Aff. ¶¶ 9-10.
[39] *Id.*

## Preliminary Injunction

[21]     A preliminary injunction is an extraordinary measure that "should not be lightly granted." *Travenol Lab., Inc. v. Turner*, 30 N.C. App. 686, 692 (1976).  It is an ancillary remedy that only will be issued if a moving party is able to show (a) a likelihood of success on the merits of its case and (b) that it is likely to sustain irreparable loss unless the injunction is issued; or if, in the opinion of the court, in weighing the respective interests of the parties, issuance is necessary for the protection of the moving party's rights during the course of litigation.[40]  *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401 (1983).  The burden is on the moving party to establish its right to a preliminary injunction.  *Id.*; *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 701 (1977); *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466 (2003); *Pruitt v. Williams*, 25 N.C. App. 376, 379 (1975); *Smith v. N.C. Motor Speedway, Inc.*, 1997 NCBC 5, ¶ 26 (N.C. Super. Ct. Nov. 12, 1997); *see also* G.S. 1-485.

## Status Quo

[22]     The parties dispute whether the Motion should be characterized as a mandatory or prohibitory injunction.  The distinction between a mandatory and prohibitory injunction is an important one because a mandatory injunction is more rare and generally disfavored as an interlocutory remedy.  *Roberts v. Madison Cnty.*

---

[40] Although Bayer has not yet filed a demand for arbitration, Bayer has indicated in its Complaint that it intends to do so with respect to all Claims alleged.  It is proper for a court to enter an injunction pending arbitration if doing so would prevent one party from eviscerating the effectiveness of the arbitration.  A pre-arbitration injunction would be proper if either the Federal Arbitration Act or North Carolina Revised Uniform Arbitration Act ("NCRUAA") controlled the parties' dispute.  *See Blumenthal v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir. 1990) (stating that federal policy favors entering an injunction if doing so would permit the parties to arbitrate disputes contemplated by their arbitration agreement); *Scottish Re Life Corp. v. Transamerica Occidental Life Ins. Co.*, 184 N.C. App. 292, 297-98 (2007) (holding that the NCRUAA permits a court to enter provisional remedies, including injunctive relief – if the requirements for an injunction are met – before an arbitrator is appointed if doing so would preserve the effectiveness of the arbitration proceeding).

*Realtors Ass'n*, 344 N.C. 394, 400 (1996); *Bd. of Light & Water Comm'rs of Concord v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 424 (1980). A preliminary injunction is a measure taken by a court to preserve the status quo of the parties during litigation. *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 227 (1990).

[23]    Here, the parties operated under the Chemtura Agreement for nearly four years before Chemtura decided to terminate the same on April 30, 2012. Chemtura contends that the status quo is that the parties do not have an agreement. As such, Chemtura argues that Bayer is seeking a mandatory injunction by forcing Chemtura to resume performance of the Chemtura Agreement.[41]

[24]    However, the status quo does not, as Chemtura would have it, "consist of a photographic replication of the circumstances existing at the moment suit was filed," but rather the status quo is "the last peaceable uncontested status that existed before the dispute arose." *Mass. Mut. v. Associated Dry Goods*, 786 F. Supp. 1403, 1427 (N.D. Ind. 1992). An "injunction is generally framed so as to restrain the defendant from permitting his previous act to operate, or to restore conditions that existed before the wrong complained of was committed." *Anderson v. Waynesville*, 203 N.C. 37, 46 (1932); *see also Rauch Indus., Inc. v. Radko*, No. 3:07-cv-197-C, 2007 U.S. Dist. LEXIS 79311, *19 (W.D.N.C. Oct. 25, 2007) (characterizing the status quo between the parties as "the time that the allegedly unlawful acts complained of reasonably may be believed to have occurred"). Adopting Chemtura's position regarding the status quo would

---

[41] Chemtura argues that it is a basic tenet of contract law that a party is not obligated to perform a contract against its will and is free to breach an arm's-length contract. Def. Resp. Opp'n Pl. Mot. Prelim. Inj. 12. While this tenet is generally true, a party's decision to breach a contract and not perform is subject to limitation when a breach would cause irreparable harm to the non-breaching party. In such a case, the issuance of a preliminary injunction would limit the right of a party to breach an arm's-length contract.

create an incentive for a party to breach an existing contract before the other party can seek injunctive relief in an effort to alter the status quo and the nature of the injunctive relief sought (i.e., mandatory relief rather than prohibitory relief).

[25]     In the present case, Bayer's breach of contract Claim arises from Chemtura's alleged wrongful termination of the Chemtura Agreement on April 30, 2012. Subsequently, Bayer filed this civil action on May 10, 2012.  The status quo between the parties is the contractual relationship that existed for over four years before the dispute arose.  As such, maintaining the status quo would have Chemtura providing Ipconazole to Bayer pursuant to the Chemtura Agreement.  Consequently, Bayer is seeking an injunction that is more appropriately characterized as a prohibitory injunction.  In substance, Bayer is seeking to prohibit Chemtura from wrongfully terminating the Chemtura Agreement (i.e., prohibit Chemtura from disrupting the status quo during the pendency of this litigation).

Likelihood of Success on the Merits of Plaintiff's Breach of Contract Claim

[26]     Bayer alleges that Chemtura breached the Chemtura Agreement by unilaterally and unjustifiably terminating the contract.

[27]     In response, Chemtura contends that its termination of the Chemtura Agreement was proper because Chemtura gave sufficient notice to Bayer that it was in material breach of the Chemtura Agreement, and Bayer failed to cure within the requisite time period.

[28]     In determining whether Bayer is likely to succeed on the merits of its breach of contract Claim, the court must determine whether Chemtura's termination of the Chemtura Agreement was proper.  In doing so, the court must examine (a) whether

the Notice was sufficient and (b) whether Bayer was in material breach of the Chemtura Agreement, which would provide proper grounds for Chemtura to terminate the contract.

[29]   As an initial matter, the Chemtura Agreement contains a choice of law clause stating that the contract is governed by New York law,[42] and the parties do not dispute that New York law should apply to Bayer's breach of contract Claim. As such, the court will apply New York law to the merits of said Claim.

[30]   The Chemtura Agreement provides specific circumstances that allow the parties to terminate the agreement prior to its initial June 20, 2015 expiration date. The Chemtura Agreement states that it may be terminated by a party "if the other party is in material breach of [the Chemtura Agreement] and fails to cure such material breach within thirty (30) days after notice . . . setting forth the details thereof with reasonable particularity has been given to such other party."[43] Essentially, the Chemtura Agreement contemplates its termination if a party has substantive grounds to terminate and takes the proper procedural steps to give the other party notice.

[31]   Chemtura provided the Notice to Bayer, contending that Bayer had materially breached the Chemtura Agreement by entering into the Monsanto Agreement. The Notice asserted that the Monsanto Agreement constituted (a) an improper assignment of Bayer's obligations under the Chemtura Agreement, without Chemtura's written consent, (b) a violation of the label/trademark clause and (c) a violation of the requirement that Bayer use commercially reasonable efforts to develop the market potential and fully promote the sale and use of Vortex.[44]

---

[42] Chemtura Agreement § 17.1.
[43] *Id.* § 12.1(a)(i).
[44] Millen Aff., Ex. 5 at 1-2. The Notice had four substantive paragraphs, each of which specifically took issue with the Monsanto Agreement. The Notice referenced four specific provisions in the Chemtura

[32]     Bayer, in its briefs and during oral argument, did not raise any procedural issues with respect to the Notice.  It appears from the letters exchanged between Chemtura and Bayer that Chemtura gave Bayer notice with reasonable particularity and the proper amount of time to cure such alleged breaches with respect to the three grounds for breach set forth in the Notice.[45]  Because Chemtura took the proper procedural steps in terminating the Chemtura Agreement, the court must decide whether Chemtura's termination of the Chemtura Agreement was substantively proper.

[33]     Chemtura argues that Bayer assigned a part of the Chemtura Agreement without Chemtura's consent.  The Chemtura Agreement provides, in pertinent part, that "this Agreement shall not be transferred or assigned, by operation of law or otherwise, by Bayer without Chemtura's prior written consent."[46]

[34]     In order to constitute an assignment under New York law, the purported assignment must result in a complete and unqualified transfer of the assignor's property, interest or right.  *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 558 (2d Cir. 1976); *Mele v. Travers*, 293 A.D.2d 950, 951 (N.Y. App. Div. 3d Dep't 2002) (citation omitted).  "An assignment at law contemplates a completed transfer of the entire interest of the

---

Agreement that were allegedly breached: sections 16.1 (concerning assignments), 9.4 (concerning labeling) and 3.1(a) and (c) (concerning commercially reasonable efforts to develop the market and promotion of sales and use of Vortex).  Chemtura's brief and oral argument in opposition to the Motion raise several new factual issues concerning Bayer's performance under the Chemtura Agreement.  These newly alleged breaches were not included in the Notice to Bayer.  The Chemtura Agreement, however, explicitly provides that a party may only terminate the contract for material breaches as to which notice is given with reasonable particularity so as to give the other party an opportunity to cure.  Regarding these newly alleged breaches, Chemtura gave Bayer no notice and no opportunity to cure.  Consequently, the newly alleged breaches cannot support Chemtura's termination of the Chemtura Agreement, and the court will only look to the issues raised by Chemtura in the Notice to determine whether Chemtura's termination of the Chemtura Agreement was proper.

[45] Chemtura sent the Notice on March 15, 2012.  On April 12, 2012, Bayer responded, denying Chemtura's allegations that a breach had occurred.  On April 24, 2012, forty days after giving notice, Chemtura notified Bayer that it was terminating the Chemtura Agreement, effective April 30, 2012, as a result of Bayer's failure to cure.  Millen Aff., Ex. 5.

[46] Chemtura Agreement § 16.1.

assignor in the particular subject of assignment, whereby the assignor is divested of all control over the thing assigned." *Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*, 10 A.D.2d 372, 376 (N.Y. App. Div. 4th Dep't 1960).

[35]     Bayer contends that the Monsanto Agreement does not constitute an assignment of its obligations to Chemtura, but it is merely a standard supply agreement whereby Bayer sells Vortex to Monsanto for use on corn seed.  Bayer further contends that due to the consolidation that exists within the commercial corn seed industry, entering into an exclusive agreement to sell Vortex to Monsanto was the best option available to promote the sale of the product.[47]

[36]     Bayer, even after entering into the Monsanto Agreement, remained obligated to Chemtura to purchase a certain amount of Ipconazole for corn seed and perform all other obligations as required by Article III of the Chemtura Agreement, entitled "Bayer's Obligations."  The court is persuaded that the Monsanto Agreement was not an assignment of Bayer's obligations in that Bayer, and not Monsanto, was the party that continued to purchase and pay for Ipconazole from Chemtura.  Additionally, the Chemtura Agreement and Monsanto Agreement contain different terms, obligations and conditions.  *See 971 Madison Ave. Corp. v. Complex Assocs.*, 90 A.D.2d 758, 758-59 (N.Y. App. Div. 1st Dep't 1982) (finding no assignment where the original contract and purported assignment contained markedly different terms and conditions).

[37]     Here, the Monsanto Agreement's initial term expired on August 31, 2013, nearly two years before the Chemtura Agreement was set to expire.  The Chemtura Agreement and Monsanto Agreement also use a different calculus to determine purchase quantities and price.  Furthermore, the Chemtura Agreement imposes

---

[47] Turner Aff. ¶¶ 6-7.

numerous obligations on Bayer, none of which are referenced in the Monsanto Agreement. These differentiating terms and conditions of the agreements are evidence that the Monsanto Agreement is a sales contract, rather than an assignment.

[38] There is no evidence in the record that Bayer manifested an intent to transfer its obligations under the Chemtura Agreement, and it appears that Bayer remains the primary obligor with respect to all portions of the Chemtura Agreement. Moreover, the court is unable to conclude at this preliminary stage that Bayer's decision to enter into the Monsanto Agreement was not a commercially reasonable effort to develop the market for and promote the sale of Vortex. As discussed, evidence is before the court that entering into the Monsanto Agreement, even on exclusive terms, may have lead to greater sales of Vortex than if Bayer sold to smaller seed producers that did not include Monsanto.[48]

[39] Finally, the court is unable to conclude that Bayer violated the Chemtura Agreement's provisions dealing with labeling. In pertinent part, the Chemtura Agreement provides that Vortex "shall be sold by Bayer . . . under [its] own labels and trademarks or trade names. . . ."[49] Under the Monsanto Agreement, Bayer sells Vortex to Monsanto under its own labels and trademarks or trade names.[50] Accordingly, it is unclear at this preliminary stage that Bayer has materially breached the labeling/trademark provisions of the Chemtura Agreement.

[40] Therefore, based on the foregoing, the court CONCLUDES that Bayer has shown a likelihood of success with regard to the issues of (a) whether Chemtura's termination of the Chemtura Agreement on April 30, 2012, was improper and (b)

---

[48] Rick Turner Aff. ¶¶ 3-7.
[49] Chemtura Agreement § 9.4.
[50] May Aff. ¶ 5.

whether Bayer will prevail on the merits of its breach of contract Claim against Chemtura.

Irreparable Harm

[41]  Bayer contends that if Chemtura is permitted to terminate the Chemtura Agreement and stop providing Ipconazole, Bayer will be unable to (a) maintain its registration for Vortex with the EPA, (b) fulfill its contractual obligations to Monsanto under the Monsanto Agreement and (c) maintain customer goodwill, market share and its competitive position in the marketplace.  Bayer argues that the potential injury to it by Chemtura's actions is material, indeterminate and irreparable should Chemtura terminate the Chemtura Agreement.

[42]  The indeterminate nature of damages may constitute irreparable harm. *A.E.P. Indus.*, 308 N.C. at 406-07 ("It is a basic principle of contract law that one factor used in determining the adequacy of a remedy at law for money damages is the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach.").  While not controlling, North Carolina federal courts have ruled that harms such as the loss of "customer goodwill" and "competitive positions, including threatened loss of market share and threatened loss of existing and potential customers" are the types of injuries that satisfy the irreparable harm requirement. *R.J. Reynolds Tobacco Co. v. Mkt. Basket Food Stores, Inc.*, No. 5:05-cv-253-V, 2007 U.S. Dist. LEXIS 6737, *34-35 (W.D.N.C. Jan. 30, 2007) (citing *R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999)); *Rauch Indus.*, 2007 U.S. Dist. LEXIS 79311, at *5 (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994)).  As recognized in those

cases, these harms are not the type that a damages award at the end of trial would adequately cure. *Rauch Indus.*, 2007 U.S. Dist. LEXIS 79311, at *5. Further, this court previously has recognized that lost goodwill and future profits[51] under certain circumstances may constitute irreparable harm for purposes of Rule 65. *GoRhinoGo, LLC v. Lewis*, 2011 NCBC 38, ¶ 39 (N.C. Super. Ct. Sept. 29, 2011) (citing *Winnfield Food Sys., Inc. v. Hardees Food Sys., Inc.*, No. 4:95-cv-5402 (M.D.N.C. Aug. 8, 1996)).

[43] Here, Bayer has demonstrated the threat of irreparable harm in that Chemtura's termination of the Chemtura Agreement would result in Bayer being unable to (a) maintain its registration for Vortex with the EPA, (b) fulfill its contractual obligations to Monsanto under the Monsanto Agreement and (c) maintain customer goodwill, market share and its competitive position in the marketplace.[52] Accordingly, Bayer has carried its burden of proof that it will be irreparably injured if an injunction is not issued.

<u>Weighing the Respective Interests</u>

[44] As discussed above, Bayer contends that it will be materially harmed if Chemtura stops performing under the Chemtura Agreement; meanwhile, Chemtura argues that it will be more significantly harmed if it is forced to continue performing under the Chemtura Agreement.

---

[51] The court acknowledges that the loss of future profits alone may not be sufficient to constitute irreparable harm. Indeed, loss of prospective profits may be a measure of contract damages. *Mosely & Mosely Builders, Inc. v. Landin Ltd.*, 87 N.C. App. 438, 446-47 (1987). The availability and sufficiency of such monetary damages precludes an award of injunctive relief. *See Bd. of Light*, 49 N.C. App. at 423 (recognizing that when "there is a full, complete, and adequate remedy at law, the equitable remedy of an injunction will not lie"). However, the court concludes that the threatened loss of future profits under the circumstances of this case, in combination with the various other losses alleged by Bayer, constitutes evidence of irreparable harm.

[52] May Aff. ¶¶ 9-10.

[45]     As reflected above, if Chemtura were allowed to cease performing, Bayer's potential damages, if it prevails at arbitration, would be significant and largely incalculable.  On the other hand, if Chemtura continues performance, it would be paid in due course by Bayer for sales of Ipconazole.  If Chemtura ultimately prevails at arbitration, then its contended damages – occasioned by lower sales and smaller market share than it would desire – would be mitigated by the Ipconazole sales, especially if Bayer were to maintain Ipconazole purchases at volumes anticipated by the Chemtura Agreement.[53]

[46]     After weighing the respective interests of the parties, the court concludes that a preliminary injunction requiring continued sale of Ipconazole under the Chemtura Agreement pending final adjudication of this matter is likely to cause Chemtura materially less damage or injury than the harm faced by Bayer should the Chemtura Agreement be terminated now.

Security

[47]     Rule 65(c) requires that the granting of a preliminary injunction shall be conditioned upon the giving of security by the applicant in a sum determined by the court to be proper for the payment of costs and damages that may be suffered by a party ultimately determined to have been wrongfully enjoined or restrained.

[48]     The parties dispute the amount of the bond that should be required as security if a preliminary injunction is issued.  Chemtura contends that if it is forced to continue performance of the Chemtura Agreement, it will suffer an annual loss in excess

---

[53] Equity dictates that if a preliminary injunction is issued with regard to Ipconazole sales, Bayer also should perform fully under the Chemtura Agreement.  It would be fundamentally inequitable for Bayer to receive Ipconazole from Chemtura without Bayer being compelled to perform its own obligations under the Chemtura Agreement.

of $11 million. Chemtura requests that the bond amount be sufficient to cover its anticipated losses should Chemtura be required to continue performing under the Chemtura Agreement. To the contrary, Bayer contends that it should only be required to post a bond that amounts to Bayer's annual sales of Vortex, which is approximately $1.5 million. However, Chemtura's contended damages, should it ultimately prevail on the merits of this matter, are based upon damages contentions substantially beyond the amount of annual sales by it to Bayer.

[49]    Accordingly, at this time, the court concludes that a posting by Bayer of security in the amount of $3 million would be reasonable and appropriate as a condition of granting the preliminary injunctive relief sought by the Motion. However, the security requirement is subject to an increase or reduction in amount, depending on the parties' submissions on this issue, which will be complete by Friday, July 20, 2012. The court will carefully consider the parties' submissions, and at a later time will determine whether the amount of security should be modified.

NOW THEREFORE, based on the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it hereby is ORDERED that:

[50]    Plaintiff Bayer CropScience LP's Motion for a Preliminary Injunction is GRANTED.

[51]    Effective upon the date of this Opinion and Order, and until final resolution of this civil action or until otherwise ordered by this court, Chemtura and its officers, agents, servants, employees, attorneys and those persons in active concert or participation with Chemtura who receive actual notice of this Opinion and Order are (a) RESTRAINED, ENJOINED and FORBIDDEN from failing to comply with the terms of

the Chemtura Agreement, and (b) ORDERED to sell Ipconazole to Bayer as provided in the Chemtura Agreement.

[52]     Further, effective upon the date of this Opinion and Order, and until final resolution of this civil action or until otherwise ordered by this court, Bayer and its officers, agents, servants, employees, attorneys and those persons in active concert or participation with Bayer who receive actual notice of this Opinion and Order are (a) RESTRAINED, ENJOINED and FORBIDDEN from failing to comply with the terms of the Chemtura Agreement and (b) ORDERED to purchase and pay for Ipconazole from Chemtura at a volume no lower on an annual basis than is contemplated by section 6.1 of the Chemtura Agreement.

[53]     Pursuant to the provisions of Rule 65(c), and as a condition of this Opinion and Order, on or before July 17, 2012, at 5:00 p.m., Bayer shall post security ("Security") in the amount of THREE MILLION DOLLARS ($3,000,000).  Said Security shall be in the form of a surety bond or other undertaking satisfactory to the Clerk of Superior Court of Durham County, for the payment of such costs and damages as may be incurred or suffered by Chemtura if it is found to have been wrongfully enjoined or restrained by this Opinion and Order.

[54]     This Opinion and Order is only intended to preserve the status quo between Bayer and Chemtura during the pendency of this litigation; except as specifically ordered herein, this Opinion and Order shall not be construed to affect the rights, obligations or liabilities of either party under the Chemtura Agreement.

[55]     Except as granted by the terms of this Opinion and Order, the Motion is DENIED.

This the 13th day of July, 2012, at 4:59 p.m.